**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

VOTEAMERICA; VOTER
PARTICIPATION CENTER,

     Plaintiffs - Appellees,

v.

SCOTT SCHWAB, in his official capacity
as Secretary of State of the State of Kansas;
KRIS KOBACH, in his official capacity as
Attorney General of the State of Kansas;
STEPHEN M. HOWE, in his official
capacity as District Attorney of Johnson
County,

     Defendants - Appellants.

------------------------------

PUBLIC INTEREST LEGAL
FOUNDATION; HONEST ELECTIONS
PROJECT; RESTORING INTEGRITY
AND TRUST IN ELECTIONS; THE
FOUNDATION FOR GOVERNMENT
ACCOUNTABILITY; ACLU OF
COLORADO; ACLU OF KANSAS;
ACLU OF NEW MEXICO; ACLU OF
OKLAHOMA; ACLU OF UTAH; ACLU
OF WYOMING; ACLU; THE CATO
INSTITUTE,

     Amici Curiae.

_____

No. 23-3100

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:21-CV-02253-KHV)**

_____

Bradley J. Schlozman, Hinkle Law Firm LLC, Wichita, KS (Kris Kobach, Attorney General of Kansas, and Anthony J. Powell, Solicitor General of Kansas, Kansas Attorney General's Office, Topeka, KS; and Scott R. Schillings and Garrett R. Roe, Hinkle Law Firm LLC, Wichita, KS, with him on the briefs), for Defendants-Appellants.

Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, New York, NY (Mark P. Johnson, Dentons US LLP, Kansas City, MO; Danielle M. Lang, Alice C. C. Huling, and Hayden Johnson, Campaign Legal Center, Washington, DC, with him on the brief), for Plaintiffs-Appellees.

Charlotte M. Davis, Public Interest Legal Foundation, Alexandria, VA, filed a brief for Amicus Curiae Public Interest Legal Foundation in support of Defendants-Appellants.

Tyler R. Green, Consovoy McCarthy PLLC, Salt Lake City, UT; and Cameron T. Norris and Conor D. Woodfin, Consovoy McCarthy PLLC, Arlington, VA, filed a brief for Amicus Curiae Honest Elections Project in support of Defendants-Appellants.

Sylvia May Mailman, Restoring Integrity & Trust in Elections, Washington, DC; and Drew C. Ensign, Phoenix, AZ, filed a brief for Amicus Curiae Restoring Integrity & Trust in Elections in support of Defendants-Appellants.

Sophia Lin Lakin, Adriel I. Cepedea Derieux, and Megan C. Keenan, American Civil Liberties Union Foundation, New York, NY; and Richard B. Goetz and Jason Zarrow, O'Melveny & Myers LLP, Los Angeles, CA, filed a brief for Amici Curiae ACLU, ACLU of Kansas, ACLU of Colorado, ACLU of New Mexico, ACLU of Oklahoma, ACLU of Utah, and ACLU of Wyoming in support of Plaintiffs-Appellees.

Stewart L. Whitson, the Foundation for Government Accountability, Naples, FL, filed a brief for Amicus Curiae the Foundation for Government Accountability in support of Defendants-Appellants.

Anastasia P. Boden, the Cato Institute, Washington, DC; Mark L. Hanin, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; Nora Q.E. Passamaneck and Leah Fugere, Wilmer Cutler Pickering Hale and Dorr LLP, Denver, CO; and David P. Yin, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, filed a brief for Amicus Curiae the Cato Institute in support of Plaintiffs-Appellees.

_____

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

To vote by mail in Kansas, a voter ordinarily must request a mail ballot by sending an application (a mail-ballot application) to the county election office. Plaintiffs VoteAmerica and Voter Participation Center (VPC) challenge on First Amendment grounds the Kansas restrictions on private parties partially filling out mail-ballot applications before they are sent to registered voters.[1] They bring freedom-of-speech and freedom-of-association claims, seeking an injunction to prevent Kansas Secretary of State Scott Schwab, Kansas Attorney General Kris Kobach, and Johnson County District Attorney Stephen M. Howe (Defendants) from enforcing the law. After a bench trial based largely on stipulated facts, and after applying strict scrutiny to the law, the district court rendered judgment in favor of Plaintiffs on both claims, enjoining the law's enforcement.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings. The chief issue on appeal is the level of scrutiny that should be employed in reviewing the freedom-of-speech challenge to the Kansas statutory restrictions on the

---

[1] The parties stipulated that VoteAmerica's activities do not violate the challenged statute, as VoteAmerica sends prefilled applications only to voters who have requested them. We therefore consider just the activities of VPC. As VoteAmerica does not seek any relief not also sought by VPC, this fact does not affect VoteAmerica's right to participate in the lawsuit or our jurisdiction over this case. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint.").

mailing of prefilled mail-ballot applications. We conclude that the restrictions should be

analyzed under intermediate scrutiny. VPC's freedom-of-speech claim must therefore be

reconsidered by the district court. Plaintiffs' freedom-of-association claim, however,

lacks merit and must be rejected.

## I.    BACKGROUND

### A.    Factual Background

The parties stipulated to the relevant facts.

#### 1.    *Voting by mail in Kansas*

When a voter sends in a completed mail-ballot application, the county election

officials compare the information included on the application with the voter's registration

information contained in Kansas's voter-registration database, the Election Voter

Information System (ELVIS). ELVIS is a dynamic system that is updated by county

officials as they receive new information. If the information sent by a voter in the mail-

ballot application "precisely match[es]" the information contained in ELVIS, or contains

only "clearly inadvertent mismatches"—such as a "minor misspelling of street name,

omitting the letter 'e' in 'George,'" or "signing as 'Jim' despite being registered as

'James,'" Aplt. App., Vol. III at 598—the county will accept the application and mail the

voter a mail ballot. If, on the other hand, the application does not contain sufficient

information, does not substantially match the voter's information in ELVIS, is illegible,

or has a signature mismatch, the county must work to "cure" the error by attempting to

contact the voter. *Id.* If county officials are not able to contact the voter, the voter will

instead be sent a provisional ballot. The county officials also check to see if the voter has

previously filed a mail-ballot application; if there are any differences between the original application and the duplicate, officials will contact the voter to resolve the discrepancy.

County officials testified that on average it takes an experienced election official three to five minutes to process an accurate, nonduplicate mail-ballot application. If a mail-ballot application needs to be cured, processing the application averages about 15 minutes of staff time. If a voter cannot be contacted and must instead be sent a provisional ballot, the process ordinarily takes 30 minutes or more of staff time. Review of a duplicate application takes 7 to 10 minutes of staff time if the voter does not need to be contacted, and can take 15 to 30 minutes or more if the voter needs to be contacted.

### 2.    *VPC and the 2020 election in Kansas*

VPC is a national organization whose mission is to promote voting among "traditionally underserved groups, including young voters, voters of color, and unmarried women at rates commensurate with voters in other groups." *Id.* at 594. It also promotes the message that "mail voting is safe, secure, accessible, and beneficial." *Id.* at 595. The primary way VPC advances these goals is through direct mailings to voters. In 2020 VPC, along with its sister organization, the Center for Voter Information (CVI), sent voters in Kansas a mail-voting packet that included several components: a  mail-ballot application, with instructions on how to vote by mail; a cover letter encouraging the voter to apply for and cast a mail ballot; and a pre-addressed and postage-paid envelope for sending the application to the county election office. The voter's name, address, and county, and the date of the election were prefilled on the application; the voter needed to provide the signature, date of birth, phone number, driver's-license or nondriver's

identification number, and the state and county where the application was completed. The cover letter advocated mail voting, saying that "[c]ounty election officials in Kansas encourage voters to use mail ballots in upcoming elections," that "[v]oting by mail is EASY," that "[v]oting by mail keeps you healthy and safe," and that "[y]ou can even research the candidates as you vote." *Id.* at 675. It also said that enclosed was a "ballot by mail application already filled out with your name and address," and included at the bottom the following postscript: "P.S. We have already filled in your name and address on the enclosed form. Please take a minute to complete the form, sign and date it, and place the form in the pre-addressed, postage-paid envelope." *Id.* At the top of the letter was a notice that there was no need to submit another ballot application if one had already been sent. And a small-print message at the bottom said that the sender "is a non-government, nonprofit . . . organization . . . [and] is not affiliated with state or local election officials." *Id.*

VPC and CVI sent mail-voting packets to about 507,900[2] Kansas voters in connection with the 2020 election. This was a substantial increase over the approximately 90,000 mail-voting packets sent by VPC in 2018. VPC and CVI obtained the information necessary to prefill the applications from a third-party vendor, Catalist, which prepared

---

[2]Apparently, not all these voters were sent a prefilled application. VPC sent five "waves" of mailers to voters in 2020, but only three of them included mailers with prefilled applications; the mailers sent in the other two waves contained only blank applications because VPC grew concerned about the accuracy of its prefilled applications. The record does not disclose how many mailers were sent in each wave. Regardless of the exact number, we infer that hundreds of thousands of prefilled applications were sent to Kansas voters in 2020 by VPC and CVI.

the data using publicly accessible information from ELVIS (in Kansas any member of the public may obtain a list of all registered voters for a fee) and commercial data, which it sometimes merged with the publicly available data. The voter data sent to the printer to be used to prefill applications was at least four-to-six weeks old by the time the forms were received by voters, which could cause errors in that information on the forms. The targeted voters received anywhere from one to five mail-voting packets. Of the voters who were sent a packet, at least 112,597 used the prepaid envelope to send in a mail-ballot application, and an estimated 69,000 of those voters used a mail-ballot application sent by VPC. Those 112,597 voters who used VPC's prepaid envelope (although not necessarily the included application) sent 127,336 applications to county election officials, meaning that 14,739 duplicate applications were sent using VPC- or CVI-provided envelopes.

There were errors in the information included in some of the mail-voting packets sent by VPC and CVI. VPC's internal data indicated that, nationally, roughly 5% of its records had a middle name or initial that did not match the voter file, and roughly 3% had a suffix that did not match. Although VPC was unaware of the rate of error in applications it sent to Kansas voters, it did provide to Defendants' expert, Ken Block, a list of a subset of 312,918 of the Kansas voters to whom it sent a mail-voting packet. Block found that VPC had sent almost 400 mailings to voters whose voter registrations had been canceled; and Plaintiffs' expert, Dr. Eitan Hersh, said that Block had identified concerns with almost 3% of the voter records in VPC's database. Block's error rate suggests that VPC and CVI sent some 15,236 erroneous applications to Kansas voters in

2020. Dr. Hersh said that with these error rates the mailings were "accurate compared to reasonable benchmarks," *id.* at 605 (internal quotation marks omitted), and "nothing out of the ordinary, given population churn and the logistics of sending large mailers out to voters," *id.* He also testified that "it seems likely that the VPC methods *reduced* the burden on election officials." *Id.* at 604 (internal quotation marks omitted).

Kansas election officials encouraged voters to vote by mail in the 2020 election, and some acknowledged that mail voting can have certain administrative advantages. Ford County Election Clerk Deborah Cox testified that she would "normally agree that at least in some ways, pre-filled . . . information increases the likelihood and the ease that her office can match information between the voter file and application." *Id.* at 599 (brackets and internal quotation marks omitted). Douglas County Elections Director Jamie Shew testified that "if not for budgetary constraints, his office would prefer to personalize the applications sent to voters with their prefilled information." *Id.* And in 2020 Johnson County sent prefilled applications containing more prefilled information than VPC (the voter's date of birth was also prefilled) to every voter in the County. Johnson County election officials said that they "decided to pre-fill as much of the voter's information from their registrant record as possible, believing that doing so makes it easier for the voter and reduces mistakes that we then have to work harder to fix on the back end." *Id.* at 600 (brackets, citations and internal quotation marks omitted).

The 2020 General Election in Kansas had "record turnout," with 1,375,125 total votes cast—a 70.9% turnout rate. *Id.* at 607. Because the election occurred during the COVID-19 pandemic, it is perhaps not surprising that the election also saw a large

increase in mail voting: 459,229 Kansas voters voted by mail in 2020, compared to 152,267 in 2018 and 173,457 in 2016, the previous presidential-election year.

Both Kansas voters and election officials expressed concerns about the mail-voting process in 2020. Kansas Elections Director Bryan Caskey "received many calls from county election officials who complained that their offices were receiving pre-filled advance voting ballot applications in which the information on the form did not match the data in ELVIS." *Id.* at 614. Caskey "regularly discussed the problem with county election officials during his weekly telephone conferences with them," and "spoke personally with election officials in at least 60 of the State's 105 counties on the subject." *Id.* Also, he had "dozens if not hundreds of conversations with county officials regarding the 'flood' of duplicate advance voting ballot applications that were being submitted by voters to such offices." *Id.* at 617 (further internal quotation marks omitted). And he spoke with "many voters who expressed their anger, confusion, and frustration over the pre-filled advance voting ballot applications that they were receiving from third-parties such as VPC." *Id.* at 616.

Shawnee County Election Commissioner Andrew Howell stated that his office "received a large number of advance voting ballot applications from voters that had been pre-filled by VPC and contained information that did not match the voters' information in ELVIS"; "the mismatched information included erroneous addresses, last names, suffixes, and/or middle initials." *Id.* at 611. Howell's office received 4,217 duplicate applications in 2020—compared to no more than a dozen in 2016 or 2018. In fact, more

than 15% of all the mail-ballot applications received by the office were duplicates.
Howell believed that most of these duplicate applications had been prefilled by VPC.

Howell also stated that "duplicate and inaccurately prefilled advance voting ballot
applications resulted in telephone calls, letters, e-mails, and in-office visits from voters
regarding what they had received from VPC," and that he spoke with "hundreds" of these
voters. *Id.* at 612. These voters often believed that the applications had been sent to them
by county election officials, and "expressed anger and frustration at the purported
incompetency of the office" and "incredulity that the office would send an application to
the wrong address or use the wrong name in pre-filling the application when they had
previously communicated such changes to the election office." *Id.* at 612. Some of those
voters who thought the prefilled applications originated with the county election office
were "confused" by them and believed they were required to complete and mail back the
prefilled applications to the election office even though they had already sent in an
application. *Id.* at 616. Some thought they were required to return the prefilled
application even though they did not intend to vote by mail; Howell's office expended
"substantial time and resources" responding to these voters. *Id.* at 617–18. Other voters
contacted Howell's office to report that prefilled applications had been sent to voters who
were deceased. Howell attested that during the 2020 election the most significant "burden
and strain" on his staff from handling ballot applications was "having to contact
thousands of voters who had submitted inaccurate or duplicate applications." *Id.* at 617.
He added, however, that his office did not collect data on the amount of time it spent
correcting errors in prefilled applications, and, when asked about voter confusion and

frustration regarding prefilled applications, he said he did not "think the prefilled information, in and of itself, was what all of the concern was." *Id.* at 612 (internal quotation marks omitted).

Ford County Election Clerk Deborah Cox attested to many of the same problems occurring in her county. Ford County received 274 duplicate mail-voting applications, representing 9% of the applications it received, a marked increase over the "handful" of duplicates—no more than 5—it received in 2016 and 2018. *Id.* at 616. Like Howell, Cox believed the majority of these duplicates to have been prefilled applications from VPC. Also like Howell, Cox attested that voters told her office they were "confused" by the prefilled applications, and that some voters believed the prefilled applications had originated with her office and they were required to complete them even if they had already submitted an application. *Id.* She also said that "she heard from 20–30 voters per day about the advance voting ballot applications they were receiving from VPC (via CVI) in the lead-up to the 2020 General Election." *Id.* at 613. Cox even went so far as to take out ads in three Ford County newspapers to remind voters that most prefilled applications had come from CVI and not from the county election office. She said that she got the idea for the ads from a similar ad that had been placed in a newspaper by the Mitchell County Clerk.

Despite these problems, "local Kansas election officials deemed [the 2020 General Election] a successful election," and Defendant Schwab said that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems." Aplt. App., Vol. III at 609 (internal quotation marks omitted).

### 3.    *Kansas statutory restrictions on prefiled mail-ballot applications*

In May 2021 the Kansas legislature enacted the law at issue in this case, H.B. 2332. Although plaintiffs originally challenged two provisions of H.B. 2332, only one, codified at Kan. Stat. Ann. §§ 25-1122(k)(1)–(2) (the Prohibition), is at issue in this appeal.[3]  That subsection states that, if "[a]ny person" "solicits by mail a registered voter to file an application for an advance voting ballot and includes an application for an advance voting ballot in such mailing," "[n]o portion of such application shall be completed prior to mailing such application to the registered voter." Kan. Stat. Ann. §§ 25-1122(k)(1)–(2). Violation of the Prohibition is a class C nonperson misdemeanor. *See* Kan. Stat. Ann. § 25-1122(k)(5).

The Prohibition contains two exceptions. First, it does not apply to the secretary of state or any election official or county election office. *See* Kan. Stat. Ann. § 25-1122(k)(4)(A). Second, it does not apply to "the official protection and advocacy for voting access agency for this state as designated pursuant to the federal help America vote act of 2002 [HAVA], . . . or any other entity required to provide information concerning elections and voting procedures by federal law." Kan. Stat. Ann. § 25-1122(k)(4)(B); *see* 52 U.S.C. § 21061(a), (d)(3) (a state "protection and advocacy

---

[3] In addition to their challenge to the Prohibition, Plaintiffs challenged a provision of H.B. 2332 that prohibited nonresidents of Kansas from sending mail-ballot applications. *See* Kan. Stat. Ann. § 25-1122(l)(1) ("No person shall mail or cause to be mailed an application for an advance voting ballot, unless such person is a resident of this state or is otherwise domiciled in this state."). Defendants agreed to a permanent injunction against enforcing this provision of the statute, so those claims are not before us.

system[]" is eligible to receive federal funds under HAVA if it is a "public or private nonprofit entity with demonstrated experience in voting issues for individuals with disabilities").

Both in district court and on appeal, Defendants have asserted a number of state interests in defense of the Prohibition. In district court those included "minimizing voter confusion and disenfranchisement, preserving and enhancing voter confidence, and reducing the rejection of inaccurate applications, inefficiencies in election administration, and potential for voter fraud." Aplt. App., Vol. III at 611 (brackets and internal quotation marks omitted). On appeal they express those interests as "the avoidance of voter confusion, facilitation of orderly election administration, enhancement of public confidence in the integrity of the election process, and deterrence of voter fraud." Aplt. Br. at 40. These rationales are not part of the legislative record for H.B. 2332. The Kansas Secretary of State submitted written testimony on the bill that "mentioned 'incomplete mail ballot applications,' but did not include any discussion of prefilled advance mail ballot applications." Aplt. App., Vol. III at 610 (internal quotation marks omitted).

### B.    Procedural History

A month after the Prohibition was enacted, Plaintiffs filed a complaint seeking a permanent injunction against Defendants' enforcement of the Prohibition and a declaration that the Prohibition violates the First and Fourteenth Amendments, both facially and as applied to VPC. The complaint also sought a preliminary injunction, which the district court granted.

13

Plaintiffs and Defendants then moved for summary judgment. In response to a suggestion by the district court, the parties filed stipulated facts and the case was submitted as a bench trial on the written record without oral argument, with the parties' summary-judgment motions serving as trial briefs.

In their summary-judgment motions, the parties disputed whether mailing the prefilled applications was protected at all by the First Amendment. Plaintiffs argued that mailing the prefilled applications was protected by the First Amendment because it was either political speech or expressive conduct, and because it was "'characteristically intertwined'" with the indisputably protected expression contained in the cover letter included in the mail-voting packets. Aplt. App., Vol. II at 233 (quoting *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). Defendants argued that the mailing was conduct that was not inherently expressive and therefore without First Amendment protection.

The parties also disagreed on the appropriate level of scrutiny to apply to the Prohibition. Plaintiffs argued that the Prohibition should be subject to strict scrutiny, which requires the Government to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (internal quotation marks omitted). Relying on *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999), they contended that the Prohibition "abridges Plaintiff's core political speech by proscribing VPC's most effective means of conveying its pro-advance mail voting message and reducing the overall quantum of speech delivering that message." Aplt. App., Vol. II at

14

237; *see Meyer*, 486 U.S. at 420, 423–24 (a prohibition on the use of persons paid to circulate ballot-initiative petitions was subject to heightened scrutiny because it had "the inevitable effect of reducing the total quantum of speech on a public issue," and "restrict[ed] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication" ). Plaintiffs also argued that the regulation should be subject to strict scrutiny because it was not viewpoint and content neutral. *See Reed*, 576 U.S. at 163 (stating that content-based laws are presumptively unconstitutional and generally subject to strict scrutiny).

Defendants argued that even if mailing the prefilled applications was speech or expressive conduct entitled to First Amendment protection, the Prohibition should be subject to the more relaxed *Anderson-Burdick* standard appropriate for certain electoral regulations. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (stating that "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,'" while "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Plaintiffs argued that even if *Anderson-Burdick* balancing applied, strict scrutiny was still appropriate because the Prohibition imposed a severe burden on VPC's First Amendment freedom of speech. *See Fish v. Schwab*, 957 F.3d 1105, 1124–25 (10th Cir. 2020) (noting that even under

*Anderson-Burdick*, "strict scrutiny applies when a state's [electoral] restriction imposes severe burdens" on a party's rights (internal quotation marks omitted)).

The parties also contested whether the Prohibition implicated VPC's associational rights. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (internal quotation marks omitted). That right includes "the right to engage in association for the advancement of beliefs and ideas." *NAACP v. Button*, 371 U.S. 415, 430 (1963) (internal quotation marks omitted). Relying on *Button*, Plaintiffs argued that the Prohibition infringed on VPC's associational rights because it limited its "chosen means for achieving" its desired change and its ability to "build relationships to increase mail voting in Kansas." Aplt. App., Vol. II at 243 (internal quotation marks omitted). Defendants, on the other hand, argued that the right to association does not protect an organization's unilateral, one-way messaging to strangers who have not otherwise chosen to associate with the organization.

Finally, the parties disagreed about whether the Prohibition was unconstitutionally overbroad. A speech regulation is constitutionally overbroad if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted). On this issue the parties essentially recapitulated their earlier arguments. Plaintiffs argued that any legitimate applications the Prohibition might have in preventing incorrectly or fraudulently completed prefilled applications were "hypothetical or rare" while its illegitimate application to protected speech (i.e., the mailing of prefilled

applications) was much broader. Aplt. App., Vol. II at 245–46. Defendants argued that the Prohibition had nothing but a legitimate sweep and thus could not be overbroad.

The court applied strict scrutiny and ruled in favor of Plaintiffs on all their claims, enjoining Defendants from enforcing the Prohibition. The court agreed with Plaintiffs that mailing the prefilled applications could not be disaggregated from VPC's cover letter (which was indisputably protected speech), and that even if the prefilled applications were considered separately from the rest of VPC's mail-voting packets, they were "inherently expressive conduct that the First Amendment embraces." *VoteAmerica v. Schwab* (*VoteAmerica I*), 671 F. Supp. 3d 1230, 1244 (D. Kan. 2023); *see id.* at 1248–49. And it held that VPC's associational rights were also implicated by the Prohibition because it abridged VPC's ability to associate with those voters to whom it sends mail-voting packets. The court further agreed with Plaintiffs that the Prohibition should be subject to strict scrutiny, *see id.* at 1250–51, because it would "reduce the total quantum of speech" on an important public issue and would "deprive [VPC] of its First Amendment right to 'select what it believes to be the most effective means' of advocating its message," *id.* at 1249 (brackets omitted) (quoting *Meyer*, 486 U.S. at 424). It reasoned that under this precedent, even if *Anderson-Burdick* balancing was the appropriate framework with which to analyze the Prohibition, it would still be subject to strict scrutiny. *See id.* at 1251. Having selected strict scrutiny as the appropriate standard with which to analyze the Prohibition, the court found that it was not narrowly tailored to serve Kansas's compelling interest in orderly and efficient elections and therefore violated VPC's First Amendment rights to freedom of speech and association. *See id.* at

1253–54. Finally, declaring that the Prohibition criminalized a "substantial amount of protected speech and association," the court held that the law was also unconstitutionally overbroad. *Id.* at 1256.

## II.    ANALYSIS

Because this opinion addresses only legal issues arising from the dispute before us, our review is de novo. *See Revo v. Disciplinary Bd. of the Supreme Ct. for the State of N.M.*, 106 F.3d 929, 932 (10th Cir. 1997) ("We review the district court's . . . ultimate conclusions of constitutional law de novo.").

### A.    Freedom-of-Speech Claim

Our analysis proceeds as follows: First, we consider whether the prefilled application should be considered on its own, apart from the cover letter. We determine that it should, because the two documents are not "characteristically" or "inextricably intertwined." Second, we consider whether mailing the prefilled application is merely conduct, or is speech under the First Amendment. We conclude that it is First Amendment speech. Third, we consider the scrutiny that we should apply to such speech. We reject Defendants' argument that the speech is governed by the *Anderson-Burdick* doctrine governing election regulation, which imposes intermediate scrutiny. Then we reject Plaintiffs' arguments that strict scrutiny is required under what they term the *Meyer-Buckley* framework or because of speaker discrimination. Finally, we discuss Plaintiffs' argument that strict scrutiny is required because the Prohibition is a content-based regulation. We agree that the Prohibition is content-based but determine that it is a facially viewpoint-neutral regulation of a type that should be subjected only to

intermediate scrutiny, absent a showing of an improper purpose or justification for the statutory prohibition.

1.     *Separability of the cover letter and the prefilled applications*

Before considering whether the Prohibition violates VPC's free-speech rights, we must first determine whether the prefilled applications included in VPC's mail-voting packets can be considered separately from the accompanying cover letter for First Amendment purposes. Plaintiffs argue that the prefilled applications are "inextricably intertwined" with the cover letter, Aplee. Br. at 21 (internal quotation marks omitted), and because the cover letter itself is indisputably protected speech, the prefilled applications, too, are protected speech. They insist that the cover letter and the prefilled applications are a "unified package of speech," which should be analyzed as a single unit because the "whole point of the cover letter is to encourage VPC's selected recipient to apply to vote by mail using the enclosed personalized application" and because the cover letter directly refers to the prefilled application in its text. Apl. Br. at 22; *see VoteAmerica I*, 671 F. Supp. 3d at 1248 ("[VPC] includes the cover letter . . . to inform and persuade the recipient that opting to vote by mail is easily done *with the attached personalized application*."). We have a contrary view.

VPC relies on two Supreme Court opinions, *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988), and *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980), which held that in certain circumstances speech not otherwise entitled to full First Amendment protection is

19

nonetheless entitled to full protection if it is in some way "intertwined" with fully

protected speech. Neither opinion controls the present context.

*Schaumburg* invalidated an ordinance prohibiting solicitation by charities that did

not use at least 75% of the solicited funds for "charitable purposes." 444 U.S. at 622. The

Court recognized that financial solicitation by charities "is undoubtedly subject to

reasonable regulation." *Id.* at 632. But "because charitable solicitation does more than

inform private economic decisions and is not primarily concerned with providing

information about the characteristics and costs of goods and services, it has not been dealt

with in our cases as a variety of purely commercial speech," which is entitled to only

limited First Amendment protection. *Id.* The regulation of charitable solicitation instead

"must be undertaken with due regard for the reality that solicitation is *characteristically

intertwined* with informative and perhaps persuasive speech seeking support for

particular causes or for particular views on economic, political, or social issues, and for

the reality that without solicitation the flow of such information and advocacy would

likely cease." *Id.* (emphasis added). Under that standard the ordinance was

unconstitutionally overbroad because "organizations whose primary purpose is not to

provide money or services for the poor, the needy, or other worthy objects of charity, but

to gather and disseminate information about and advocate positions on matters of public

concern" would "necessarily spend more than 25% of their budgets on salaries and

administrative expenses and would be completely barred from solicitation." *Id.* at 635.

The ordinance would be a death knell for such organizations.

The Supreme Court was not, however, establishing some sort of mechanical test that gave full First Amendment protection to everything physically connected to speech. It was saying only that courts should keep in mind the practical consequences of a restriction on charitable solicitations when assessing the validity of such a restriction. That proposition hardly helps VPC. To begin with, we see no reason to believe that enclosing unsolicited prefilled applications is an action "characteristically intertwined" with get-out-the-vote mailings; indeed, VoteAmerica apparently does not send prefilled applications unless requested. And more importantly, a prohibition on that activity is hardly a death knell, or even a substantial burden, on VPC's communicating by mail the importance and the ease of voting by mail. Kansas's Prohibition does not stop VPC from including blank applications in its mailers, from touting their use and the benefits of mail voting, or even from including in a separate document all the information they want to include in the prefilled applications.

*Riley* is even more clearly inapplicable. In that case the Supreme Court invalidated a law requiring "professional fundraisers to disclose to potential donors the gross percentage of revenues retained in prior charitable solicitations." 487 U.S. at 784. The Court said that even if "speech is necessarily commercial whenever it relates to that person's financial motivation for speaking," such speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Id.* at 795–96. What did the Court mean by "inextricably intertwined"? A year later it explained that the mandatory disclosure in *Riley* was "'inextricably intertwined'" with the other speech "because the state law *required* it to be included." *Bd. of Trs. of*

*State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989). After all, *inextricable* generally means "incapable of being disentangled or untied." *Webster's Third New International Dictionary* at 1157. We fail to see how enclosure of a prefilled application was inextricably tied to the cover letter in the mailing by VPC. *Cf. Lichtenstein v. Hargett*, 83 F.4th 575, 586–89 (6th Cir. 2023) (rejecting First Amendment challenge to statutory ban on giving anyone an application for an absentee ballot). For one thing, as previously noted, the mailings by VoteAmerica apparently did not include unsolicited prefilled applications.

Because we reject Plaintiffs' characterization of the cover letter and prefilled applications as being inextricably intertwined, we consider only the prefilled applications in analyzing the First Amendment implications of the Prohibition.

### 2.  *Mailing the prefilled applications is protected speech*

Defendants argue that mailing the prefilled applications is not speech for First Amendment purposes. They say that the Prohibition "targets only *non-expressive conduct*." Aplt. Br. at 12. We are not convinced.

As an initial matter, there is no denying that the prefilled applications "include words chosen by VPC . . . written on a page." Aplee. Br. at 27. While the Supreme Court has "long recognized that [the First Amendment's] protection does not *end* at the spoken or written word," *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (emphasis added), it does begin there. Defendants contend that not "every piece of written text, irrespective of context, is protected speech." Aplt. Br. at 18. But the very fact that prefilling the application adds words written on a page by VPC creates a strong presumption that VPC

22

is engaged in speech under the First Amendment. *See Giebel v. Sylvester*, 244 F.3d 1182, 1186–87 (9th Cir. 2001) ("The argument that handbills announcing a subsequent speech are not, in and of themselves, speech protected by the First Amendment is patently wrong. . . . In general, words communicating information are 'speech' within the meaning of the First Amendment, whether or not the words convey important ideas.").

Nor does the fact that the prohibited conduct is VPC's *mailing* the unsolicited prefilled applications somehow transform its activity from "speech" into "conduct." "Whether government regulation applies to creating, distributing, or consuming speech makes no difference" to First Amendment analysis. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011).

The characterization of the speech as mere "information," also cannot carry the day. In *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 564 (2011), the Supreme Court struck down a Vermont law that prohibited, with exceptions for certain speakers (such as those engaged in "educational communications"), "the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors." Vermont had argued that "sales, transfer, and use of prescriber-identifying information are conduct, not speech," while the First Circuit had upheld the prohibition on the ground that such information was "a mere 'commodity' with no greater entitlement to First Amendment protection than 'beef jerky.'" *Id.* at 570 (citations omitted). The Court, however, declared that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Id.*

We recognize that *Sorrell* declined to foreclose the creation of "an exception to the rule that information is speech." *Id.* at 571. It said there was "no need to consider that request in this case" because the "content- and speaker-based restrictions on the availability and use" of prescriber data imposed a "burden on protected expression" that justified heightened scrutiny, even if the prescriber information were considered a "mere commodity," just as it would be impermissible to prohibit trade magazines from using ink. *Id.* (citing *Minneapolis Star v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983)). But we are not aware of any recognized exception to treating information as speech. The caselaw is to the contrary. *See, e.g.*, *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 46–48 (2017) (communicating credit-card-surcharge fee is speech); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (communicating price of alcohol is speech); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) ("information on beer labels" is "speech"); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985) (brief description of organization on a government pamphlet seeking charitable contributions would be speech); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195–97 (10th Cir. 2017) (collecting "resource data" is protected as the creation of speech); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1116–17 (9th Cir. 2020) (publishing date of birth or age is speech); *Giebel*, 244 F.3d at 1186–87 (handbills "announcing a . . . speech" are protected speech). We are not inclined to pioneer such an innovation.

Nor does it matter that the speech is banal or merely conveys the obvious. The Supreme Court's decision in *United States v. Stevens* characterized as "startling and dangerous" the government's suggestion that First Amendment protection is conditioned

on whether the speech at issue "is deemed valueless or unnecessary." 559 U.S. 460, 470–71 (2010). As the Court explained, "*Most* of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation." *Id.* at 479 (internal quotation marks omitted). "Even wholly neutral futilities come under the protection of free speech as fully as do Keats' poems or Donne's sermons." *Id.* at 479–80 (brackets, ellipses, and internal quotation marks omitted).

Defendants argue that this case is different because the information being conveyed is already known to the recipients. But they cite no authority that recognizes such a distinction, and we see no reason to exempt a "reminder" (such as conveying the name and address used when the person registered to vote) from First Amendment protection. At the least, the proffered proposition would be problematic in practice. For one thing, where does one draw the line? For example, VPC's prefilled applications included, beyond recipients' own personal information, the date of the election, which most recipients had likely heard but forgotten. Would such information be sufficiently "unknown" to the recipients to merit First Amendment protection?

Defendants also argue that the information used by VPC is not speech because it is "freely available to everyone." Aplt. Br. at 17. But once more they cite no authority for that proposition, and we agree with Plaintiffs that "[c]onveying information does not lose its First Amendment protection because [the information] is available on Google." Aplee. Br. at 29. Defendants' arguments are premised on the idea that the information contained on the applications is useless and near-meaningless to its recipients, and thus not

25

deserving of First Amendment recognition, an argument foreclosed by the proposition that "[e]ven wholly neutral futilities come under the protection of free speech[.]" *Stevens*, 559 U.S. at 479–80 (brackets, ellipses, and internal quotation marks omitted).

Finally, we reject Defendants' arguments that because the prefilled applications, standing on their own, do not express a clear message (say, encouraging the recipient to vote), they do not merit First Amendment protection. Such arguments are relevant to whether a party's *conduct* is sufficiently communicative to be protected by the First Amendment. *See Cressman v. Thompson*, 798 F.3d 938, 961 (10th Cir. 2015) ("[A] court will only find symbolic speech where a plaintiff can identify a message that a reasonable onlooker would perceive."). But, "[i]n contrast, with respect to pure speech, it is not clear . . . whether a plaintiff must identify any message at all—let alone one that a reasonable observer would discern"—to receive First Amendment protection. *Id.* (collecting cases); *cf. Stevens*, 559 U.S. at 479–80 ("Even wholly neutral futilities come under the protection of free speech[.]" (brackets, ellipses, and internal quotation marks omitted)). Moreover, even if the prefilled applications do not communicate a *message*, there is no denying that they communicate *information*, and as we have already discussed, the communication of even simple information is entitled to First Amendment protection.

In sum, VPC's mailing of the prefilled mail-ballot applications constitutes speech entitled to First Amendment protection. Because we hold that such activity constitutes speech, we decline to address whether it might also constitute protected expressive conduct.

26

We now determine what level of judicial scrutiny must be applied to this infringement of free speech.

### 3.    *Anderson-Burdick balancing*

Defendants contend that we must analyze the Prohibition under the *Anderson-Burdick* balancing test used for determining the constitutionality of electoral regulations. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018) ("[W]e analyze electoral regulations using the now-familiar *Anderson–Burdick* balancing test."). We disagree.

Under the *Anderson–Burdick* balancing test,

> A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). "Under this standard, the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. When an election regulation imposes "severe restrictions" on those rights, it "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotation marks omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted).

In *Anderson*, 460 U.S. at 782, the Supreme Court considered a challenge to Ohio's requirement that independent candidates (Anderson was an independent candidate for President) qualify for the ballot by March of the election year, even though nominees of political parties had a significantly later deadline. The Court held that Ohio's deadline placed an unconstitutional burden on Anderson's supporters with respect to their voting and associational rights under the First and Fourteenth Amendments. *See id.* at 782, 786. It recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 788 (internal quotation marks omitted). But it said that "[a]n early filing deadline may have a substantial impact on independent-minded voters," because, among other things, it limited their candidates' ability to respond to and take advantage of the various developments that happen in the course of a Presidential campaign, imposing the "disadvantage" of "inflexibility" on independent candidates while maintaining for major-party candidates "the political advantage of continued flexibility." *Id.* at 790–91. Balancing the "character and magnitude" of this injury to the rights of Anderson's supporters against the "extent to which [Ohio's] interests [made] it necessary to burden" those rights, *id.* at 789, the Court concluded that Ohio's "minimal interest" in imposing a March deadline—supposedly to provide time to educate voters on the candidates, ensure equal treatment with party candidates, and maintain political stability—could not justify the substantial burdens imposed by the regulation, *see id.* at 796–806.

In *Burdick* the Court considered the constitutionality of Hawaii's prohibition on write-in voting. *See* 504 U.S. at 430. Applying the balancing test from *Anderson*, the Court weighed the burden the write-in ban imposed on voters' rights against the interests Hawaii asserted for adopting it. *See id.* at 434. It decided that "in light of the adequate ballot access afforded under Hawaii's election code," the write-in voting ban "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote." *Id.* at 438–39. Hawaii's "legitimate interests" in (1) reserving "the general election ballot for major struggles and not a forum for continuing intraparty feuds," (2) "focus[ing] the attention of voters upon contested races in the general election," and (3) preventing the manipulation of the electoral system were therefore "sufficient to outweigh the limited burden that the write-in voting ban impose[d] upon Hawaii's voters." *Id.* at 439–40 (internal brackets, ellipses, and quotation marks omitted).

Defendants would apparently have the courts apply the *Anderson-Burdick* test whenever an election law is challenged. But the test does not extend that far. Neither the Supreme Court nor this circuit has applied *Anderson-Burdick* balancing to all First Amendment challenges to any law that could be described as an election regulation. *See Lichtenstein*, 83 F.4th at 593 ("[T]he Supreme Court has not applied the *Anderson-Burdick* test to all First Amendment claims in the election or voting context."). The test is used only for regulation of "the mechanics of the electoral process," not "regulation of pure speech." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (addressing restrictions on anonymous campaign literature). "The *Anderson-Burdick* balancing test has historically applied to claims that an election law interferes with the right of *voters* to

29

vote or *political parties* to associate with voters—not the right of *speakers* to speak,"
*Lichtenstein*, 83 F.4th at 589–90; *see Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 142 (3d
Cir. 2022) ("[T]he *Anderson-Burdick* test does not apply to laws that are primarily
directed at regulating 'pure speech.'" (quoting *McIntyre*, 514 U.S. at 345)). If the
government is preventing a speaker from *saying* something (other than through the
medium of casting a ballot for the party or candidate of their choice or by registering for
a political party), even in the context of an election-related law, *Anderson-Burdick*
balancing is inappropriate, and ordinary First Amendment standards apply.

As correctly summarized by the Sixth Circuit: "[T]he Supreme Court [has] applied
[*Anderson-Burdick* balancing only] to three types of claims: ballot-access claims,
political-party associational claims, and voting-rights claims." *Lichtenstein*, 83 F.4th at
590–91. *Anderson* and *Burdick* were themselves ballot-access claims—that is, challenges
to restrictions on persons or issues that the electorate can vote for. Political-party
associational claims are "challenges to the information that a state puts on its ballot [and
voter-registration lists] and to the way the state conducts primaries [or party
conventions]." *Id.*; *see, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552
U.S. 442, 444, 451–58 (2008) (in Washington primary elections all voters can vote for
any candidates and the top two votegetters regardless of party proceed to the general
election; Court rejected challenge by political parties to provision allowing candidates to
self-identify with a party on the ballot, claiming that voters could be misled into thinking
candidate is endorsed by the party); *Timmons v. Twin Cities Area New Party*, 520 U.S.
351, 358–59 (1997) (rejecting challenge to Minnesota ban on "fusion" candidates, who

appear on the ballot as the candidate of more than one party). And voting-rights claims are challenges to laws, such as voter-identification or voter-qualification requirements, that may "violate a voter's right to vote under the Fourteenth Amendment's Due Process or Equal Protection Clauses." *Lichtenstein*, 83 F.4th at 591; *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 185, 189–91, 204 (2008) (two three-Justice opinions applied *Anderson-Burdick* balancing to reject challenge to Indiana law requiring voters to present government-issued photo identification); *see also Mazo*, 54 F.4th at 140–42

(collecting cases). This circuit likewise has applied *Anderson-Burdick* balancing only to

ballot-access claims,[4] party associational claims,[5] and voting-rights claims.[6, 7]

_____

[4] *See, e.g.*, *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (minor party candidates not put on ballot for lack of sufficient petition signatures); *Campbell v. Buckley*, 203 F.3d 738, 740–41, 745 (10th Cir. 2000) (limiting each ballot initiative to one subject); *Coal. for Free & Open Elections, Prohibition Party v. McElderry*, 48 F.3d 493, 495, 496–97 (10th Cir. 1995) (challenge to Oklahoma ban on write-in voting in presidential and vice-presidential elections); *Hagelin for President Comm. of Kan. v. Graves*, 25 F.3d 956, 957–59  (10th Cir. 1994) (challenge to Kansas filing deadlines for independent candidates); *Thournir v. Meyer*, 909 F.2d 408, 409 (10th Cir. 1990) (issued before *Burdick* but applying *Anderson* to requirement that an independent candidate be registered as an independent for at least a year before filing nomination petition); *Rainbow Coal. of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 741–43 (10th Cir. 1988) (issued before *Burdick* but applying *Anderson* to challenge to Oklahoma requirements for number of signatures and filing deadlines for nominating petitions); *Populist Party v. Herschler*, 746 F.2d 656, 657, 659 (10th Cir. 1984) (issued before *Burdick* but applying *Anderson* to challenge to Wyoming signature and deadline requirements for nominating petitions); *Blomquist v. Thomson*, 739 F.2d 525, 526–27 (10th Cir. 1984) (issued before *Burdick* but applying *Anderson* to challenge to Wyoming requirement that majority of petition signatures not come from a single county).

While resting much of its decision on the Qualifications Clause of the Constitution and *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783, 837 (1995) (striking down Arkansas term limits for election to Congress as violative of the Qualifications Clause), this court in *Campbell v. Davidson*, 233 F.3d 1229, 1233 (10th Cir. 2000), also relied on *Burdick*'s "flexible standard" in holding unconstitutional a Colorado requirement that candidates for national office be registered to vote in the district in which they seek election.

[5] *See, e.g.*, *Cox*, 892 F.3d at 1076–77 (challenge to Utah regulation allowing candidates who did not qualify for primary ballot at party convention to then qualify through petition signatures); *Const. Party of Kan. v. Kobach*, 695 F.3d 1140, 1141, 1144 (10th Cir. 2012) (challenge to Kansas's refusal to record the affiliation of registered voters with unrecognized political parties); *Beaver v. Clingman*, 363 F.3d 1048, 1051–52, 1055–56 (10th Cir. 2004) (challenge to Oklahoma's prohibition of member of one party from voting in primary of another party), *rev'd*, 544 U.S. 581, 584, 586–87 (2005) (reversing Tenth Circuit's application but not its use of *Anderson-Burdick* balancing); *Rainbow Coal. of Okla.*, 844 F.2d at 747 (issued before *Burdick*, applying *Anderson* to challenge to Oklahoma law limiting voters' ability to designate membership in unrecognized political party when registering to vote); *Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir. 1984) (issued before *Burdick*, applying *Anderson* to challenge (1) Colorado law limiting voters' ability to designate themselves on their voter registrations as

The limits of *Anderson-Burdick* are illustrated by the cases from the Supreme Court and this court which have not applied that framework. In *McIntyre* a woman fined for distributing anonymous handbills opposing a school tax levy challenged as unconstitutional Ohio's prohibition on the distribution of anonymous campaign literature. *See* 514 U.S. at 336–38 & n.3. Of course, such a regulation could be considered an *election regulation*, and Ohio therefore placed its "principal reliance" on the *Anderson-Burdick* balancing test. *See id.* at 344–45. The Supreme Court disagreed. It refused to apply *Anderson-Burdick* balancing in analyzing the Ohio regulation and instead subjected it to exacting scrutiny, explaining that Ohio's prohibition on anonymous campaign literature did "not control the mechanics of the electoral process" but was a "regulation of pure speech," a "direct regulation of the content of speech." *Id.* at 345.

Similarly, the Supreme Court applied strict-scrutiny analysis—not *Anderson-Burdick* balancing—in considering challenges to a Minnesota law prohibiting judicial

---

affiliated with parties other than the Republican or Democratic parties, (2) Colorado's permitting candidates to designate themselves as representing minor party even though not endorsed by party, and (3) Colorado's not permitting minor parties to have poll watchers).

[6] *See, e.g.*, *Fish*, 957 F.3d at 1110, 1121–22 (challenge to Kansas law requiring documentary proof of citizenship for voter registration); *A.C.L.U. of N.M. v. Santillanes*, 546 F.3d 1313, 1316, 1321 (10th Cir. 2008) (challenge to Albuquerque, New Mexico requirement that voters present photo identification at polling places).

[7] On occasion we may invoke *Anderson-Burdick* but then decline to use balancing because we decide at the outset that when the electoral regulation imposes a "severe" restriction on First or Fourteenth Amendment rights we turn to exacting-scrutiny analysis. *Burdick*, 504 U.S. at 434 (internal quotation marks omitted); *see Am. Const. L. Found., Inc. v. Meyer*, 120 F.3d 1092, 1100 (10th Cir. 1997), *aff'd sub nom. Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999).

candidates from speaking on certain topics during a campaign. *See Republican Party of Minn. v. White*, 536 U.S. 765, 768, 774 (2002). It subjected regulations on independent political expenditures to strict scrutiny, because they "burden[ed] political speech." *See Citizens United v. FEC*, 558 U.S. 310, 318, 340 (2010). And in *Meyer* a Colorado ban on the use of paid petition circulators seeking to get an initiative on the ballot was reviewed under "exacting scrutiny" as a "limitation on political expression," 486 U.S. at 416, 420. The Court also subjected "disclosure requirements [of signatories to referendum petitions] in the electoral context" to exacting scrutiny. *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010). And the Court has not applied the *Anderson-Burdick* test to analyze restrictions on speech in and around polling places. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 5, 12 (2018) (interior of polling site was nonpublic forum); *Burson v. Freeman*, 504 U.S. 191, 193, 196–98 (1992) (plurality opinion) (speech outside polling place was in public forum but restriction satisfied exacting scrutiny); *id.* at 214–16 (Scalia, J., concurring) (speech was in nonpublic forum).

Neither has our court used *Anderson-Burdick* to analyze all challenges to election-related laws. *See, e.g.*, *Frank v. Lee*, 84 F.4th 1119, 1126, 1140 (10th Cir. 2023) (applying *Burson* plurality's forum-based analysis to a First Amendment challenge to Wyoming restrictions on electioneering near polling places); *Riddle v. Hickenlooper*, 742 F.3d 922, 924, 927–28 (10th Cir. 2014) (analyzing Colorado campaign-contribution law under the modified intermediate-scrutiny standard applied to contribution limits); *Chandler v. City of Arvada*, 292 F.3d 1236, 1238, 1241 (10th Cir. 2002) (applying strict scrutiny to regulation prohibiting petition circulation by nonresidents of city); *Citizens for*

*Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1186, 1196–97,

1199 (10th Cir. 2000) (applying strict scrutiny to independent-expenditure disclosure and

disclaimer requirements).

We conclude that the Prohibition is not subject to *Anderson-Burdick* balancing.

The Prohibition does not regulate any of the electoral mechanisms traditionally analyzed

under *Anderson-Burdick* balancing: it does not control ballot access; the ability of

political parties to associate with candidates or voters, or vice versa; or voters' ability to

vote. *See Lichtenstein*, 83 F.4th at 591–93 (explaining that it "would have to expand

*Anderson-Burdick*'s balancing test into uncharted territory" if it applied that test to a

challenge to a ban on distributing blank official forms for applying to vote absentee,

because the ban did not involve ballot-access, political-party-associational, or voting-

rights claims). Instead, as we have already explained, the Prohibition stops VPC from

speaking (in the form of mailing prefilled applications to Kansas voters). Because the

Prohibition regulates not the "mechanics of the electoral process" but instead "pure

speech," *McIntyre*, 514 U.S. at 345, *Anderson-Burdick* balancing is not the appropriate

standard with which to analyze its constitutionality.

### 4.    *Meyer-Buckley strict scrutiny*

Plaintiffs' choice for the appropriate standard of review for this case is strict

scrutiny as required by what it calls the "*Meyer-Buckley* framework," Aplee. Br. at 30,

referring to the Supreme Court decisions in *Meyer v. Grant*, 486 U.S. 414 (1988), and

*Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182 (1999). We cannot agree.

Both opinions concerned restrictions on those who circulate ballot-initiative petitions. The decisions held (1) that petition circulation "is 'core political speech,'" because it involves 'interactive communication concerning political change'"; (2) that "First Amendment protection for such interaction . . . is 'at its zenith,'" *Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422, 425); and therefore (3) that heightened scrutiny[8] applied to the challenged regulations. In particular, in explaining why a Colorado law banning the use of persons paid to circulate ballot-initiative petitions was subject to heightened scrutiny, *Meyer* reasoned that the prohibition on paid circulators had "the inevitable effect of reducing the total quantum of speech on a public issue," and that it "restrict[ed] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." 486 U.S. at 423–24. The *Meyer* Court then went on to make the apparently far-reaching statement that "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.* at 424.

The district court relied on this last language from *Meyer* in subjecting the Prohibition to strict scrutiny, concluding that "[u]ltimately, the [Prohibition] would

---

[8] *Meyer* described the level of scrutiny it was applying as "exacting scrutiny," 486 U.S. at 420, but did not elaborate. The term has been described as requiring "a substantial relation between [the First Amendment burden] and a sufficiently important governmental interest." *Ams. for Prosperity Found.*, 594 U.S. 595, 607 (2021) (opinion of Roberts, C.J.). In practice it may be hard to distinguish from strict scrutiny. *See Meyer*, 486 U.S. at 425 (describing "the burden that Colorado must overcome to justify this criminal law" as "well-nigh insurmountable"). In any event, because we hold that *Meyer* is inapplicable to the case in front of us, and neither party has raised the issue, we need not consider how, if at all, the terms differ.

reduce the total quantum of speech on this important public issue and deprive plaintiff of its First Amendment right to 'select what [it] believe[s] to be the most effective means' of advocating its message." *VoteAmerica I*, 671 F. Supp. 3d at 1249 (quoting *Meyer*, 486 U.S. at 424). Plaintiffs' appellate brief takes this proposition still further, arguing that "[i]t is VPC's subjective belief that matters under *Meyer-Buckley*," and thus, because it "believes that distributing personalized applications is the most effective means of conveying its pro-advance mail voting message," the Prohibition must be subjected to strict scrutiny. Aplee. Br. at 31.

We begin by addressing Plaintiffs' contention that VPC's subjective beliefs about the most effective means of advocating its cause are determinative of whether the Prohibition merits strict scrutiny. This would be a most peculiar doctrine. It would put a premium on discovery regarding whether a speaker actually thought another approach would be more effective. What if a group of people were being prosecuted and they differed in their view of the best strategy? And if taken to its logical conclusion, this doctrine would overturn decades of First Amendment law. It is likely that O'Brien thought (probably correctly) that burning his draft card was the most effective means of publicizing his antiwar message, *see United States v. O'Brien*, 391 U.S. 367, 370 (1968); that Rock Against Racism thought that unrestricted control of volume level at its concerts was the most effective means of "espous[ing] and promot[ing] [its] antiracist views," *Ward v. Rock Against Racism*, 491 U.S. 781, 784 (1989); and that the anti-abortion advocates in *McCullen v. Coakley* thought that interacting with abortion-clinic visitors within 35 feet of clinic entrances was the most effective way to promote anti-abortion

sentiment, *see* 573 U.S. 464, 469, 485–86 (2014). Yet the regulations in these cases were subjected to intermediate scrutiny, not strict scrutiny.

We therefore do not think the Supreme Court intended to give the "what they believe" sentence in *Meyer* the import argued by Plaintiffs. There is nothing remarkable about the statement that "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." 486 U.S. at 424. The issue is not whether the selection is protected by the First Amendment but what the government must show to overcome that protection. And the holding in *Meyer* requires the application of strict scrutiny only to limited circumstances defined by an objective standard—namely, when those with a message are deprived of "the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. In other words, *Meyer* should be understood to hold only that courts should subject to strict scrutiny any deprivation of the tried and true essentials for politicking.

Indeed, Justice Stevens, the author of *Meyer*, apparently so characterized this aspect of its holding. In a footnote to his concurrence in *Nixon v. Shrink Missouri Government PAC*, which upheld the constitutionality of certain campaign-contribution limits, Justice Stevens said that while money could be used to purchase protected speech, it did not follow that the First Amendment provided to the use of money the same protections it provided to speech,

> [u]nless, of course, the prohibition *entirely forecloses a channel of communication*, such as the use of paid petition circulators. *See, e.g.*, *Meyer*[, 486 U.S. at 424] ("Colorado's prohibition of paid petition circulators restricts

> access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing").

528 U.S. 377, 398 & n.* (2000) (Stevens, J., concurring) (ellipsis omitted and emphasis added).

At least one other court has also understood *Meyer* in the same way. In *Foti v. City of Menlo Park*, anti-abortion picketers challenged a law regulating the size of the signs they could carry, arguing that they had a "First Amendment right 'not only to advocate their cause but also to select what they believe[d] to [be] the most effective means for so doing,'" and that this First Amendment right "protect[ed] their method of spreading their message" through the use of signs larger than those permitted by the law. 146 F.3d 629, 641 (9th Cir. 1998) (quoting *Meyer*, 486 U.S. at 424). Rejecting this argument, the Ninth Circuit explained that the statute in *Meyer* had "restricted access to the circulators' chosen *avenue* of speech—direct one-on-one communication," which was why the *Meyer* court had struck down the law. *Id.* "[T]he First Amendment protects [the picketers'] right to choose a particular means or avenue of speech—picketing—to advocate their cause in lieu of other avenues," but the picketers could not "dictate the *manner* in which they convey their message within their chosen avenue. Government may regulate the *manner* of speech in a content-neutral way but may not infringe on an individual's right to select the *means* of speech." *Id.* at 641–42.

The Kansas Prohibition is a far cry from "restrict[ing] access to" an entire "fundamental . . . avenue of political discourse," as in *Meyer*, 486 U.S. at 424. VPC may

continue using the mails to send unsolicited letters to Kansas voters advocating for mail voting and may even include a separate sheet with all the information VPC previously placed on prefilled applications along with a blank application and instructions for using it. The mailing of prefilled applications is hardly a "fundamental" method of communication or one that "is the essence of First Amendment expression," like the distribution of political leaflets or the one-on-one discussions accompanying the circulation of petitions. *McCullen*, 573 U.S. at 488–89 (internal quotation marks omitted). In short, despite the Prohibition, VPC remains free to choose what avenue of communication it will use to advocate for mail voting, including the use of unsolicited mailers. *Meyer* does not demand application of strict scrutiny in the present context.

Nor do we agree with Plaintiffs or the district court that strict scrutiny is merited because the Prohibition will "reduce the total quantum of speech" on the issue of advance-mail voting. *VoteAmerica I*, 671 F. Supp. 3d at 1249 (citing *Meyer*, 486 U.S. at 423). This argument again isolates a single phrase from *Meyer* to advocate a proposition that would invalidate most speech regulations by subjecting them to strict scrutiny. Almost all speech regulations, even most permissible regulations on the time, place, or manner of speech, in a sense "reduce the total quantum of speech" by preventing some speech from occurring. Read in context, however, the statement in *Meyer* about reduction in the quantum of speech was just the preface to the discussion that followed, which elaborated on the effect of the prohibition in restricting access to the "most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. Eliminating an avenue of political discourse

certainly reduces the quantum of speech. Thus, we have said that "strict scrutiny is applied where the government restricts the overall quantum of speech available to the election or voting process . . . [as with] restrictions on campaign expenditures, as in [*Buckley v. Valeo*, 424 U.S. 1 (1976)], the available pool of circulators or other supporters of a candidate or initiative, as in [*Am. Const. L. Found., Inc. v. Meyer* (*ACLF*), 120 F.3d 1092, 1104 (10th Cir. 1997), *aff'd sub nom. Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182] and [*Meyer*, 486 U.S. 414], or the anonymity of such supporters, as in *ACLF*, *Valeo*, and *McIntyre v. Ohio Elections Comm'n*[, 514 U.S. 334, 347 (1995)]." *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000). Each placed a substantial burden on a particular means of communication, far from the minor burden on VPC imposed by the Prohibition.

We therefore reject Plaintiffs' argument that the "*Meyer-Buckley* framework" compels application of strict scrutiny to the Prohibition.

### 5. *Speaker neutrality*

Another argument by VPC for heightened scrutiny is that the Prohibition discriminates based on the speaker because of its exception for the "official protection and advocacy for voting access agency" for the State designated by HAVA, *see* Kan. Stat. Ann. § 25-1122(k)(4)(B), and that this lack of speaker neutrality renders it content based and therefore subject to strict scrutiny. We disagree.

True, the Supreme Court has at times pointed to serious problems with speaker-based speech restrictions. *See Citizens United*, 558 U.S. at 340 ("[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are

restrictions distinguishing among different speakers, allowing speech by some but not others. . . . Speech restrictions based on the identity of the speaker are all too often simply a means to control content." (citations omitted)); *Sorrell*, 564 U.S. at 571 (prohibition on distribution of prescriber information by pharmaceutical manufacturers and marketers "imposes a speaker- and content-based burden on protected expression, and that circumstance is sufficient to justify application of heightened scrutiny"). But later cases, though restating the general principle that speaker-based distinctions are suspect, have clarified and moderated this seemingly absolute language. The Court has rejected the view that speaker-based speech regulations *automatically* demand the application of strict scrutiny. It has limited the proposition by explaining that "'laws favoring some speakers over others demand strict scrutiny *when the legislature's speaker preference reflects a content preference.*'"  *Reed*, 576 U.S. at 170 (emphasis added) (quoting *Turner Broad. Sys.*, 512 U.S. 622, 658 (1994)); *accord Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619–20 (2020) (quoting *Reed*).

This clarified speaker-discrimination test—which first asks whether a regulation's speaker preference reflects a content preference before subjecting it to strict scrutiny—reconciles the Supreme Court's caselaw, which has at times affirmed the propriety of speaker-based distinctions without applying strict scrutiny. For example, in *McCullen* the Court held that a law making it a crime to stand on a sidewalk within 35 feet of an abortion clinic was content neutral despite its containing four speaker-based exceptions, including for clinic employees. *See* 573 U.S. at 469, 472, 485. Although the anti-abortion groups challenging the law claimed that the speaker-based exemption for clinic

employees demanded application of strict scrutiny, there was nothing "inherently suspect" about allowing clinic employees access to their place of employment, and there was nothing in the record suggesting that clinic employees had used the statutory exemption to express a pro-abortion viewpoint in places where anti-abortion protesters were prohibited. *See id.* at 482–85. And in *Turner Broadcasting System* the Court ruled similarly when considering a federal law requiring cable-television operators to carry local broadcast-television stations. *See* 512 U.S. at 626. The cable operators argued that this "must-carry" provision demanded strict scrutiny because it reflected a "speaker preference" for broadcast programmers over cable programmers. *Id.* at 657. The Court rejected this argument, explaining that "the view that all regulations distinguishing between speakers warrant strict scrutiny . . . is mistaken," *id.*, and held that application of strict scrutiny was not called for, given that Congress enacted the "must-carry" provision because of fears about the economic well-being of the broadcast industry, not disagreement with the content of cable programming, *see id.* at 657–59; *id.* at 658 ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.").

Other circuits have also upheld speaker-based distinctions when they are not an attempt to discriminate based on content or viewpoint, and have explained that such distinctions do not automatically render a statute subject to strict scrutiny despite the language disfavoring speaker-based distinctions in *Citizens United* and *Reed*. *See Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019) (stating that "speaker-based bans are not automatically content based or content neutral," and holding that a ban on the

receipt by legislators of gifts from lobbyists—presumably because much of their job is

speaking to legislators—was content neutral because of the State's anticorruption purpose

and the absence of evidence that the ban's purpose was disagreement with the message of

any speech); *Gresham v. Swanson*, 866 F.3d 853, 855–56 (8th Cir. 2017) (rejecting

argument that *Citizens United* meant that a speaker-based exception to a statutory ban on

robocalls rendered the statute content based); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d

303, 305 (7th Cir. 2017) (upholding anti-robocall statute with speaker-based exceptions

as content neutral); *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v.

Castille*, 799 F.3d 216, 222–23 (3d Cir. 2015) (different attorney-admission requirements

for attorneys from reciprocal and nonreciprocal states did not trigger strict scrutiny

because the distinction was not based on any preference for what certain speakers have to

say); *Doe v. Harris*, 772 F.3d 563, 575–76 (9th Cir. 2014) (statute that required sex

offenders to provide law enforcement with all internet identifiers and all internet service

providers used by the offender was not subject to strict scrutiny despite making "speaker-

based distinctions" because it was not justified by reference to the content of the

burdened speech); *cf. Doe v. Shurtleff*, 628 F.3d 1217, 1220, 1223 (10th Cir. 2010)

(upholding as content neutral a statute requiring disclosure to the State, by sex offenders,

of their internet identifiers and corresponding websites).

    The Prohibition's speaker-based exception for the HAVA-designated state voting-

access agency does not "reflect[] a content preference" and so does not render the

Prohibition content based. *Reed*, 576 U.S. at 170 (internal quotation marks omitted). Any

organization can communicate in multiple ways with voters about how to vote by mail

and the advantages and disadvantages of doing so. The restriction on prefilling the forms does not impose any burden on those communications. Most voters have no need for someone else to fill out the application form. And for those who do need help, who better to help than an agency specifically charged with helping the disabled in the election process? There is no reason to infer that the special status given that agency has any connection to a content preference. The Prohibition's speaker distinctions therefore do not render it content based and are not subject to strict scrutiny.

### 6. *Content-based discrimination*

We next turn to Plaintiffs' argument that the Prohibition is subject to strict scrutiny because it discriminates based on content. We reject the argument. In our view, the Prohibition is among the narrow group of content-based but viewpoint-neutral regulations subject only to intermediate scrutiny.

The general rule is: "Content-based regulations of speech—i.e., regulations based upon either the content or the subject matter of the speech—must meet strict scrutiny, whereas content-neutral regulations of speech—i.e., regulations justified without reference to the content of the regulated speech—must meet intermediate scrutiny." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021) (internal quotation marks omitted). But in addition to "distinguish[ing] between content-based and content-neutral regulations of speech," Supreme Court "precedents distinguish further a particularly egregious form of content discrimination—viewpoint discrimination," and both "these distinctions inform [the Supreme Court's] assessment under the First Amendment." *Vidal v. Elster*, 602 U.S. 286, 292–293 (2024) (internal quotation marks

omitted). As we proceed to explain, the second distinction is particularly important in the analysis of Plaintiffs' claim.

The core concern of the First Amendment speech clause is that there be a free exchange of ideas—of viewpoints. To protect that free exchange, content-based restrictions must ordinarily be subject to strict scrutiny. "[T]he rationale of the general prohibition is that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007) (ellipsis and internal quotation marks omitted).

But the Supreme Court has "identified numerous situations in which that risk is inconsequential, so that strict scrutiny is unwarranted." *Id.* Although the present situation is not among those previously identified by the Supreme Court, three cases in particular that also address viewpoint-neutral restrictions suggest that the Prohibition would be a good fit for such less-demanding scrutiny.

In *Vidal* itself the Court upheld a content-based but viewpoint-neutral trademark restriction even though it had twice held that "trademark restrictions that discriminate *based on viewpoint* violate the First Amendment." 602 U.S. at 293. (emphasis added). The challenged law prohibited "the registration of a mark that consists of or comprises a name identifying a particular living individual except by his written consent." 602 U.S. at 291 (brackets, ellipsis and internal quotation marks omitted) (citing 15 U.S.C. § 1052(c)). The Court said that the names clause "does not facially discriminate against any viewpoint," nor does it so discriminate in practice. *Id.* at 293–94. But it is content based because it "turns on the content of the proposed trademark—whether it contains a

person's name," thereby treating trademarks containing names "differently from trademarks conveying other types of ideas." *Id.* at 294–95 (brackets and internal quotation marks omitted). Therefore, the Court had to "consider for the first time the constitutionality of a content-based—but viewpoint-neutral—trademark restriction." *Id.* at 295. It ultimately concluded that "[b]ecause of the uniquely content-based nature of trademark regulation and the longstanding coexistence of trademark regulation with the First Amendment, we need not evaluate a solely content-based restriction on trademark registration under heightened scrutiny." *Id.* at 300. The Court added, however, that it was not foreclosing that a content-based trademark restriction might pass muster even without the historical tradition supporting the names clause. *See id.* at 307–08; *id.* at 311 (concurring opinion of Kavanaugh, J., joined by Roberts, C.J.) ("In my view, a viewpoint-neutral, content-based trademark restriction might well be constitutional even absent such a historical pedigree."); *id.* at 323–25 (Barrett, J., concurring, joined by Kagan, J. and Sotomayor, J.) (not relying fully on history to justify the names clause).

For an example of an application of intermediate scrutiny without any reliance on history, we need look no further than *Davenport*. In that opinion the Supreme Court upheld a state statute that forbade a public-sector union from using agency fees deducted from the wages of nonmember public employees to influence an election or operate a political committee without affirmative authorization from the nonmember. *See* 551 U.S. at 181–82. The statute drew "distinctions based on the content of the union's speech" by "requiring affirmative consent only for election-related expenditures while permitting expenditures for [other ideological] purposes [not germane to collective-bargaining

duties] unless the nonmember object[ed]." *Id.* at 188. In support of the statute, the Court said that it did "not believe that the voters of Washington impermissibly distorted the marketplace of ideas when they placed a reasonable, viewpoint-neutral limitation on the State's general authorization allowing public-sector unions to acquire and spend the money of government employees." *Id.* at 189. "Quite obviously," it said, "no suppression of ideas is afoot, since the union remains as free as any other entity to participate in the electoral process with all available funds other than the state-coerced agency fees lacking affirmative permission." *Id.* at 190. The Court found relevant its precedent stating that "the government can make content-based distinctions when it subsidizes speech," *id.* at 188–89 (citing *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548–550 (1983)), and that "when the government permits speech on government property that is a nonpublic forum, it can exclude speakers on the basis of their subject matter, so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum," *id.* at 189 (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 799–800, 806 (1985)).

Another recent decision further illustrates that the Supreme Court does not feel compelled to apply strict scrutiny whenever the application of a government regulation requires examining the content of a message. In *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), the Court considered a municipal ordinance prohibiting any new off-premises sign—that is, "a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site," *id.* at 66 (internal

quotation marks omitted). Of course, one could not determine whether a new sign was prohibited without reading what it said. But the Court held that the ordinance was subject only to intermediate scrutiny unless evidence showed that it was enacted for a purpose or justification contrary to First Amendment principles. *See id.* at 76. It explained that "[a] sign's substantive message itself is irrelevant to the application of the provisions; there are no content-discriminatory classifications for political messages, ideological messages, or directional messages concerning specific events, including those sponsored by religious and nonprofit organizations." *Id.* at 71. "Rather, the City's provisions distinguish based on location: A given sign is treated differently based solely on whether it is located on the same premises as the thing being discussed or not. The message on the sign matters only to the extent that it informs the sign's relative location." *Id.* It analogized the restriction to a category of restrictions long recognized as subject only to intermediate scrutiny, saying, "The on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions." *Id.*; *see Ward*, 491 U.S. at 791 (recognizing the validity of reasonable restrictions on time, place, or manner of speech).

We now turn to an analysis of the Prohibition, which forbids partially filling out a mail-ballot application that is sent to a registered voter unless the voter consents. To begin with, we agree with Plaintiffs that the Prohibition "prohibits certain content on its face: the information necessary to complete any portion of an advance mail ballot application." Aplee. Br. at 35. That is, the Prohibition applies only to speech with a certain communicative content.

Nevertheless, with the above context in mind, we think the threat to free speech posed by the Prohibition is sufficiently small that (absent evidence that it was enacted for an improper purpose or justification) adequate protection is provided by intermediate scrutiny. Although VPC cannot, without invitation, complete answers to the questions on the mail-ballot application seeking noncontroversial demographic information to satisfy legal requirements, it can provide that information to the voter in multiple alternative ways, including, for instance, on a sheet with that information attached to the form. We are not sufficiently imaginative to see how the Prohibition could "effectively drive [any] ideas or viewpoints from the marketplace." *Davenport*, 551 U.S. at 188.

Moreover, to state the obvious, the use of forms by the government inherently requires content restrictions. One would be hard-pressed to name an official form that is not accompanied by a set of instructions on how to complete it—instructions which not uncommonly exceed the length of the form itself. In particular, instructions governing the time, place, and manner in which someone can fill out for another person a government form seeking noncontroversial information do not on their face suggest hostility to any idea or point of view. Nor do we see how subjecting such regulations to less than strict scrutiny would be to start down a slippery slope that would lead to inadequate oversight of government regulation that does threaten free speech. After all, like the "uniquely content-based nature of trademark regulation," *Vidal*, 602 U.S. at 300, the history of regulations (instructions) governing the filling out of noncontroversial information on government forms provides substantial comfort that such regulation is fully compatible with a lively market in controversial ideas. We think the likelihood that the Prohibition's

restrictions on what can be done with a government form would impair the free marketplace of ideas is even less than the potential impairment from the somewhat analogous context of content restrictions on the use of government property constituting a nonpublic forum.

We therefore conclude that (absent evidence of an improper purpose or justification for the statutory provision) the proper level of scrutiny to apply to the Prohibition under the Free Speech Clause of the First Amendment is intermediate scrutiny, which requires that the "restriction on speech or expression . . . be narrowly tailored to serve a significant governmental interest." *City of Austin*, 596 U.S. at 76 (internal quotation marks omitted).

We recognize that Plaintiffs argue that the Prohibition "unconstitutionally singles out certain speech based on viewpoint" in that it "applies solely to views *advocating* for mail voting because only those communications would include a personalized application." Aplee. Br. at 36 (internal quotation marks omitted). The argument seems to be that because pro-mail-voting groups are more likely to use prefilled applications to advance their message, the Prohibition is discriminating against VPC's viewpoint. This argument, however, is not addressed to whether the Prohibition is facially viewpoint neutral. Rather, it concerns whether "an impermissible purpose or justification underpins" the Prohibition. *City of Austin*, 596 U.S. at 76. On remand the district court can consider argument and evidence regarding whether the purpose or justification for the Prohibition was to suppress speech favoring mail voting.

### 7.    *Overbreadth*

Finally, Plaintiffs claim that the Prohibition violates the First Amendment right of free speech because it is overbroad. We reject the claim.

As the Supreme Court recently explained, "[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023). "If the challenger demonstrates that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Id.* at 770. "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statutes lawful sweep." *Id.*

The problem with Plaintiffs' overbreadth claim is that neither they nor the district court has articulated a distinct overbreadth analysis. The district court's discussion merely repeated the reasons for which it held the Prohibition unconstitutional. In essence, it said that every application of the Prohibition is unconstitutional so, of course, its unconstitutional applications are disproportionate to the constitutional ones. The discussion of overbreadth in Plaintiffs' brief on appeal is of the same ilk. Plaintiffs do not acknowledge any legitimate application of the Prohibition and "have not attempted to demonstrate that the [statute] applies to any conduct more likely to be protected by the First Amendment than their own [conduct]." *Faustin v. City and Cnty. of Denver, Colo*. 268 F.3d 942, 948 (10th Cir. 2001) (internal quotation marks omitted).

As this court has repeatedly explained, "The overbreadth doctrine has no application to [a] case" where the "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006) (en banc); *see Faustin,* 268 F.3d at 948 ("The overbreadth doctrine does not apply where there is no significant difference between the claim that the ordinance is invalid because of overbreadth and the claim that it is unconstitutional when applied to the plaintiff's own activities."). The overbreadth claim must be dismissed with prejudice.

### 8.    *Applying intermediate-scrutiny review*

Unless, for the reasons identified above, the district court determines again that the Prohibition must be reviewed under strict scrutiny, it should apply intermediate scrutiny. Under intermediate scrutiny the government must show that the regulation "is narrowly tailored to achieving significant government interests, and . . . leaves open ample alternative channels of communication." *Brewer*, 18 F.4th at 1220. The government has the burden of persuasion in this inquiry. *See id.*; *Doe v. City of Albuquerque*, 667 F.3d 1111, 1131 (10th Cir. 2012). We leave to the district court in the first instance to apply that standard. We reverse the district court's order on Plaintiffs' freedom-of-speech claim and remand to the district court for consideration, with the benefit of more full and focused briefing by the parties (and perhaps further evidence), of the remaining free-speech issues in this case.

### C.      Freedom-of-Association Claim

Plaintiffs also bring a freedom-of-association challenge to the Prohibition. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Ams. for Prosperity Found.*, 594 U.S. at 606 (internal quotation marks omitted). That right includes "the right to engage in association for the advancement of beliefs and ideas." *Button*, 371 U.S. at 430 (internal quotation marks omitted).

The district court agreed with Plaintiffs that the Prohibition implicates VPC's right to association. As evidence, it pointed out that VPC "identifies a specific group of voters to target for its associations and continues to associate with these voters by, for example, tracking responses to its personalized applications and sending further get-out-the-vote communications" and that "69,000 voters joined plaintiff's common endeavor by requesting advance mail ballots" using VPC's mailers. *VoteAmerica I*, 671 F. Supp. 3d at 1245. We view the matter differently. We hold that the Prohibition does not implicate VPC's associational rights.

The Supreme Court's decision in *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989), illustrates the proper approach. In *Stanglin* the city restricted attendance at certain dance halls to minors between the ages of 14 and 18 and certain adults. *See id.* In rejecting a claim that this violated the associational rights of the dancers, who were thereby prevented from associating with adults in those dance halls, *see id.* at 22, the Court explained that opportunities for dance-hall patrons to interact with each other "simply do not involve the sort of expressive association that the First Amendment has

been held to protect," *id.* at 24, since the hundreds of patrons who congregated at these establishments were not "members of any organized association"; "[m]ost [were] strangers to one another"; and there was "no suggestion" that they "[took] positions on public questions," *id.* at 24–25 (internal quotation marks omitted).

The language used by *Stanglin* to describe the patrons of Dallas dance halls also describes the hundreds of thousands of recipients of VPC's mailers that VPC claims to be "associating" with. Those voters who receive unsolicited mailers from VPC are not "members of any organized association," whether of VPC or any other pro-mail-voting group; they are "strangers to one another"; and they do not take "positions on public questions" together. Far from taking a shared stance on public questions, the recipients of its mailers whom VPC claims to be "associating" with may not even agree with its stance on mail voting. Indeed, from the "anger" some voters expressed upon receipt of the mailers, it is likely that a number of recipients in fact actively disagreed with VPC's project. Aplt. App., Vol. III at 614.

*Button,* relied on by Plaintiffs, does not help them. In that case a Virginia law prohibited the improper solicitation of business by lawyers. *See* 371 U.S. at 419–20. The Supreme Court held that Virginia's use of the law to forbid the NAACP from encouraging members of the public to work with it as civil-rights plaintiffs violated the group's First Amendment rights, including its right to association. *See id.* at 419–20, 437. The NAACP did not "underwrite ordinary damages actions," and "the assisted litigant receive[d] no money" from the NAACP or the staff lawyers. *Id.* at 420. The Court reasoned that the NAACP's litigation activity was "not a technique of resolving private

differences; [but] a means for achieving [its] lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country" and "thus a form of political expression" protected by the First Amendment. *Id.* at 429. Plaintiffs and the district court say that VPC's mailing of prefilled applications is its "chosen 'means for achieving' its desired result: persuading its audience to request a mail ballot and assisting them in such process," and therefore its mailings are associational activity just as protected by the First Amendment as the NAACP's recruitment of civil-rights plaintiffs was in *Button*. *VoteAmerica I*, 671 F. Supp. 3d at 1245 (quoting *Button*, 371 U.S. at 429).

True, *Button* supports the proposition that the First Amendment freedom of association protects the right of an organization to solicit strangers to associate with the organization. But the most that recipients of VPC's mail do is send in an application for a ballot. They do not join VPC for some group effort. When the NAACP solicited members of the community to become civil-rights plaintiffs, those individuals made their own decisions to closely associate with the NAACP by joining them in litigation, and they did so to assist the NAACP's efforts to end segregation. *See Button*, 371 U.S. at 420–22. Voters contacted by VPC do not associate with VPC in any way comparable to the relationship formed between civil-rights litigants and their attorneys. That some recipients use VPC's prefilled application does not, as Plaintiffs claim, mean those voters have associated with VPC to further a "common goal." Aplee. Br. at 40. Their "association" with VPC is just transactional. VPC has no more of an associational relationship with the recipients of its mailers than an advertiser has with the recipient of

an advertisement when the recipient buys the advertised product. VPC seeks to "increase[e] electoral engagement through mail voting," *id.*, while the voters who used its prefilled applications might have done so for all sorts of reasons. VPC's mailings do not seek volunteers to assist VPC or even make a financial contribution. The mere fact that a voter uses a mail ballot does not mean the voter endorses, much less joins, the organizational ends of the group that helped them obtain that ballot. *Button* thus is readily distinguishable.

Plaintiffs also point to *Healy v. James*, 408 U.S. 169, 181 (1972), to support their claim that interference with a group's outreach efforts can implicate the freedom of association. In *Healy* a college denied official recognition to a student group, a decision that prohibited the group from using campus bulletin boards or the school newspaper. *See id.* The Supreme Court noted that if a student organization was to "remain a viable entity" on campus, it needed access to these means of reaching "new students," and thus the college's denial of official recognition implicated the student group's associational rights. *Id.* But *Healy*, too, is not in point. *Healy* involved the singling out of a student group for "denial of use of campus facilities for meetings and other appropriate purposes." *Id.* That is, the banned student group in *Healy* was denied access to basic aspects of campus organizational life that were granted to recognized student groups at the college. Nothing like this type of abridgement of VPC's associational rights has occurred here. It retains every ability to reach out to new and potential members. It was not soliciting memberships when it sent out applications, and nothing prevented it from doing so if it

wanted to. There was no wholesale denial of the means to solicit members and meet with them, as in *Healy*. Plaintiffs' reliance on *Healy* is misplaced.

Because the Prohibition does not implicate VPC's associational rights, we reverse the district court's judgment in favor of VPC on its freedom-of-association claim and remand with instructions to enter judgment for Defendants on this claim.

### III.    CONCLUSION

We **REVERSE** the district court's rulings in favor of Plaintiffs' overbreadth and freedom-of-association claims and **REMAND** to the district court for entry of judgment in favor of Defendants. On the remaining claims we **REVERSE** the rulings of the district court and **REMAND** for further proceedings consistent with this opinion.