No. 23-3100

_____

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

VOTEAMERICA, et al.,

*Plaintiff-Appellees*,

v.

SCOTT SCHWAB, in his official capacity as Secretary of State of the
State of Kansas, et al.,

*Defendant-Appellants*.

_____

Appeal from the United States District Court
for the District of Kansas, No. 21-2253-KHV

_____

## AMICUS CURIAE BRIEF OF RESTORING INTEGRITY AND
## TRUST IN ELECTIONS SUPPORTING APPELLANTS

_____

Appeal from the U.S. District Court for the District of Kansas
Honorable Kathryn H. Vratil, District Judge
District Court Case No. 2:21-CV-02253-KHV-GEB

_____

Sylvia May Mailman
Restoring Integrity & Trust in
Elections
1233 20th St NW
Washington, D.C. 20036
MayMailman@riteusa.org

Drew C. Ensign
202 E. Earll Drive
Suite 490
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Fax: (602) 542-8308
drewensignlaw@gmail.com

*Counsel for Amicus Curiae RITE*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT ................................................................................. 7

I.    The Act Does Not Implicate The First Amendment .......................... 7

    A.   The District Court Improperly Relied Upon Plaintiffs' Accompanying Speech ........................................................... 7

    B.   Pre-Filling Absentee Ballot Applications Is Not Inherently Expressive Conduct ........................................................... 10

    C.   Any Inherently Expressive Message Conveyed By Pre-Filling Forms Is Merely Incidental To The State's Regulation Of Conduct .. 14

II.   Even Assuming Plaintiffs' Conduct Enjoyed Any Constitutional Protection, The District Court Erred By Failing To Apply *Anderson-Burdick* Doctrine ..................................................................... 16

    A.   Other Circuits Have Uniformly Held That *Anderson-Burdick* Governs *All* Constitutional Challenges To Regulations Of Electoral Procedures ........................................................................ 18

    B.   This Court Similarly Refused To Permit Freestanding Constitutional Challenges Outside Of the *Anderson-Burdick* Framework ....................................................................... 23

    C.   The District Court's Approach Would Invite Electoral Chaos .... 26

    D.   The District Court's Error Requires Reversal ............................. 29

III.  The District Court Misapplied *Anderson-Burdick* By Wrongly Discounting Kansas's Important Regulatory Interests ......................... 31

CONCLUSION ................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acevedo v. Cook Cty. Officers Electoral Bd.*,
  925 F.3d 944 (7th Cir. 2019) .......................................................... 4, 21

*Anderson v. Celebrezze*, 460 U.S. 780 (1983).................................... 18, 19

*Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021) ...... 22

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) ............................... 6, 11, 13, 36

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..................................... 18, 19, 27

*Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000) ........................ 17, 24

*Cooper Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157 (2004)..... 25

*Crawford v. Marion Cty. Election Bd.* 553 U.S. 181 (2008) ....... 17, 30, 31

*DNC v. Reagan*, 329 F. Supp. 3d 824 (D. Ariz. 2018).............................. 13

*DNC v. Reagan*, 904 F.3d 686 (9th Cir. 2018) ........................................ 14

*LaRouche v. Fowler,* 152 F.3d 974 (D.C. Cir.1998) ................................ 22

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) ..................................... 3, 30

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124 (3d Cir. 2022)....... 19, 21

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)............ 5, 19, 20

*New Georgia Project v. Raffensperger*, 976 F.3d 1278
  (11th Cir. 2020) ..................................................................................... 22

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)........................ 21

*Richardson v. Texas Sec'y of State*, 978 F.3d 220 (5th Cir. 2020).......... 21

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ............................................... 3, 15

*Soltysik v. Padilla*, 910 F.3d 438 (9th Cir. 2018).................................... 19

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................... 4

*Storer v. Brown*, 415 U.S. 724 (1974). .................................................... 26

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997). ...... 18, 26

**Page(s)**

**CASES (cont.)**

*Utah Republican Party v. Cox*, 892 F.3d 1066 (10th Cir. 2018)............. 24

*VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341

   (N.D. Ga. 2022) ................................................................ 5, 9, 12, 17, 20

*Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008)..... 25

**STATUTES**

K.S.A. §25-1122(k)(2) ................................................................ 1

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I §4 cl. 1. ........................................................... 26

## INTEREST OF AMICUS CURIAE

Restoring Integrity and Trust in Elections ("RITE") is a 501(c)(4) non-profit organization with the mission of protecting the rule of law in elections in the United States. RITE is a non-partisan, public-interest organization dedicated to protecting elections as the democratic voice of the people.

As part of that mission, RITE seeks to defend the electoral process from tactics that risk sowing distrust in outcomes, such as Plaintiffs' suit here, which challenges a common-sense election integrity measure that imposes, at most, *de minimis* burdens. RITE respectfully submits this brief as Amicus Curiae in support of the State of Kansas (the "State"), which appeals from the district court's judgment invalidating K.S.A. § 25-1122(k)(2) (the "Act"), a law that facilitates election administration in Kansas by prohibiting third parties from unsolicited pre-filling of personal information for voters on applications for absentee ballots.[1]

---

[1] Pursuant to Rule 29(a)(4)(E), counsel for RITE certifies that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than *amicus curiae* RITE contributed money to fund the brief's preparation or submission. Counsel for all parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

This case exemplifies an unfortunate trend in modern election litigation: Plaintiffs dressed up a truly minuscule burden as a putative constitutional violation requiring federal micro-management of States' administration of their elections. To describe the burden is to demonstrate its triviality: some modest number of able-bodied, sound-of-mind voters may (absent the district court's injunction) be required to fill in their own name and address on a state form to request an absentee ballot—a process that might otherwise take a voter a minute or less. That's it.

To be sure, it would be quite another matter if the Constitution had anything to say directly on the subject. A two-cent poll tax, for example, would squarely violate the Twenty-Fourth Amendment no matter how minute that burden might be. But one can scour the Constitution from Preamble to Twenty-Seventh Amendment without encountering even a vague allusion to the district court's newly discovered right of third parties to pre-populate pedigree information for voters on absentee ballot applications. That holding is all the more remarkable as "there is no constitutional right to an absentee ballot" at all, *Mays v. LaRose*, 951 F.3d

775, 792 (6th Cir. 2020)—let alone a freestanding constitutional "right" to request an absentee ballot without having to first fill out a minimal amount of personal information.

To transmute the *de minimis* burden at issue here into a full-blown violation of the Constitution, the district court committed three crucial legal errors—each one of which requires reversal. *First*, the district court held that pre-filling ballot application forms was protected under the First Amendment as expressive conduct. But that practice is not even modestly expressive, let alone so "inherently expressive" as to enjoy First Amendment protection as expressive conduct.

In particular, the district court's reliance on Plaintiffs' cover letter accompanying the pre-filled applications to transform mere paperwork into protected expressive conduct (App.III 645) contravenes *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). There, the Supreme Court unanimously rejected the approach of "combining speech and conduct … to create expressive conduct." *Id.* at 66. The district court's contrary reasoning would resurrect that discredited approach.

Similarly, the district court's reasoning that pre-populating pedigree fields conveyed an "inherently expressive" message that voting

3

by mail is "safe, secure and accessible" (App.III 643) cannot withstand even gentle scrutiny. To the extent that a potential mail-in voter receives *any* message from seeing a name and address pre-printed on a form—a name and address that might not even be theirs—it is not one so obvious as to be "inherently expressive."

That is, if *any* message about "security" of mail-in balloting is discernable from pre-filling ballot applications—and no such message is discernable—the ability of complete strangers to obtain voters' pedigree information and fill it out for them would tend to imply the *in*security of mail-in balloting. The putative "inherently expressive message" here thus actually lies somewhere between inscrutable and a 180-degree-antipode of Plaintiffs' contention.

The district court also ignored altogether the Supreme Court's repeated admonition that "the First Amendment does not prevent restrictions directed at conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (citing *Rumsfeld*, 547 U.S. at 62). The challenged Act unambiguously regulates only *conduct*—*i.e.*, the *act* of filling out ballot applications for third parties. Any burden on speech is merely incidental to that conduct-based

regulation—particularly as Plaintiffs remain completely free to *say* whatever they like in their expressive materials.

*Second*, even assuming that the pre-filling of mail-in ballot applications implicates the First Amendment, which it does not, the district court erred by applying ordinary First Amendment standards instead of the *Anderson-Burdick* framework, which the Supreme Court has established for evaluating *all* constitutional challenges to the "mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

In doing so, the district court rejected the uniform approach of no less than *seven* other circuits. Not one other circuit has held otherwise. The district court also splits with the Northern District of Georgia, which considered a strikingly similar challenge by the same Plaintiffs to an equivalent Georgia law, and explicitly held that the asserted burdens could only be considered under the *Anderson-Burdick* framework. *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341, 1357, 1360-61 (N.D. Ga. 2022).[2]

---

[2] The plaintiffs in *Raffensperger* also included Plaintiffs' affiliate, Center for Voter Information ("CVI"), which is not a party here.

5

If there were any way to reconcile the district court's opinion with the decisions of the Third, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits, the court failed to supply one—instead ignoring *all* of them. The upshot is that this Court would have to create a distinctly lopsided circuit split to affirm the district court here and without any apparent justification for doing so.

*Third*, the district court erroneously gave short shrift to Kansas's important regulatory interests at issue here, including its interest in conducting orderly and efficient elections. The district court largely ignored that Plaintiff Voter Participation Center's ("VPC's") equivalent conduct in other States has created substantial disruption and voter confusion, and imposed considerable burdens on elections officials. The district court's refusal to grapple meaningfully with this evidence gravely undercuts its weighing of the State's interests. And Kansas need not "wait[] for [these well-documented problems elsewhere] to occur and be detected within its own borders" before "tak[ing] action to prevent" them. *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021).

## ARGUMENT

## I.    The Act Does Not Implicate The First Amendment

Plaintiffs' claims fail at the threshold because pre-filling ballot applications does not implicate the First Amendment *at all*. The district court reasoned otherwise by (1) improperly relying on messaging materials included with the pre-filled applications, (2) concluding that pre-filled applications conveyed an "inherently expressive" message that that advance mail voting is "safe, secure and accessible" (App.III 643), and (3) ignoring that any burden on speech here is merely incidental to the regulation of conduct.

### A.    The District Court Improperly Relied Upon Plaintiffs' Accompanying Speech

To bring Plaintiffs' *conduct* in pre-filling applications within the ambit of the First Amendment, the district court relied heavily on the speech that Plaintiffs include in messaging materials sent with the pre-filled forms. The district court thus placed substantial weight on the "application packets includ[ing] speech that communicates a pro-mail voting message." App.III 645. The district court further *explicitly* refused to "disaggregate the application and plaintiff's other voter engagement materials." *Id.*

This is not a new tactic, and instead is the precise one employed by plaintiffs in *Rumsfeld*. There the plaintiffs attempted to rely on the speech *accompanying* their conduct (a boycott) to conjure First Amendment protection for the latter. To no avail.

As the Court explained, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Rumsfeld*, 547 U.S. at 66. In *Rumsfeld,* "[t]he expressive component of a law school's actions [wa]s not created by the conduct itself but by the speech that accompanie[d] it." *Id.* Indeed, plaintiffs' reliance on "explanatory speech" to establish inherent expressiveness of conduct was in fact "strong evidence" that the speech was "not so inherently expressive" as to qualify for First Amendment protection. *Id.* Thus, because the "actions [at issue] were expressive only because [plaintiffs] accompanied their conduct with speech explaining it," the conduct was not inherently expressive. *Id.*

That approach makes perfect sense: if conduct requires explanatory speech to understand its intended message, then the conduct is not "inherently" expressive *by definition*. And that rule is controlling here: Plaintiffs' reliance on "speech that accompanie[d]" the pre-filled ballot

applications is indistinguishable from *Rumsfeld*, and equally merits rejection. Similarly, by explicitly refusing to "disaggregate" Plaintiffs' accompanying speech from their actual conduct, App.III 645, the district court short-circuited the requisite expressive conduct analysis and violated *Rumsfeld*.

Notably, a different district court considering a virtually identical challenge by Plaintiffs here correctly applied *Rumsfeld* to reject the expressive conduct claim, explaining that "combining speech (in the cover information) with the conduct of sending an application form, as Plaintiffs do here, *is not sufficient* to transform the act of sending the [pre-filled] application forms into protected speech." *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d at 1357 (emphasis added). Instead, "Plaintiffs' pro-absentee voting message is not necessarily intrinsic to the act of sending prospective voters an application form." *Id.* Rather, "[t]he necessity of the cover message [wa]s 'strong evidence' that the conduct of sending an application form is not so inherently expressive as to qualify for First Amendment protection." *Id.*

The district court here, however, ignored *VoteAmerica v. Raffensperger* entirely, even though it was directly on point and issued

eleven months prior. Its unreasoned split with the Northern District of Georgia rests on patent error.

### B. Pre-Filling Absentee Ballot Applications Is Not Inherently Expressive Conduct

Shorn of its erroneous reliance on accompanying speech, what remains of the district court's reasoning that pre-populating pedigree fields constitutes "inherently expressive" conduct is untenable. Indeed, its central premise that such conduct inherently "communicat[ed] that advance mail voting is safe, secure and accessible" (App.III 643) fails on every level.

*"Secure."* It is hard to understand how pre-populating name and address fields conveys a message that voting by mail is secure, let alone "inherently" does so. Indeed, to the extent *any* message about mail-in ballot security is discernable, it is not what Plaintiffs contend. Instead, voters could easily conclude that strangers unconnected to the State in any way obtaining their pedigree information and unilaterally pre-filling their election forms demonstrates the *in*security of mail-in balloting. After all, a voter might think about how easily that mail piece might have ended up in another person's mailbox, how easily that person could sign and return it, receive a mail-in ballot under false pretenses, and vote it

in violation of the law. *See* Kansas Opening Br.41-47 (discussing evidence of errors plaguing Plaintiffs' mailings). Such a voter might also start to wonder about whether third parties are using their information to engage in other types of election-related activity without their knowledge. Indeed, it is well-known that "'absentee balloting is vulnerable to abuse in several ways,'" and the district court offered no explanation as to how pre-filling ballot applications could possibly dispel concerns about any such potential abuses—let alone how doing so could "inherently" communicate such a message. *Brnovich*, 141 S. Ct. at 2347 (alteration and citation omitted).

*"Safe."* Nor does pre-filling out ballot applications convey any inherently expressive message about whether mail-in voting is "safe." It is equally "safe" for voters to fill out their personal information themselves in the safety of their own homes as it is for third parties to do it for them at distant sites. "Safety" is simply not implicated either way.

*"Accessible."* Finally, the conduct prohibited by the Act does not send any "inherently expressive" message about whether voting by mail is "accessible." Nothing about pre-filling absentee ballot applications adds anything expressive to what is inherently non-expressive, that is

11

sending out blank applications. Filling in fields that call for names and addressed with names and addresses does not convert a blank form into a political statement. And rather than inherently expressing a view that voting by mail is "accessible," pre-filling forms for voters could more readily be understood as instead conveying a message that voting is, in Plaintiffs' eyes, unmanageably difficult unless Plaintiffs hold their hands through the process.

*Clarity of Message*. The putative message about security, safety, and accessibility of voting by mail is thus both difficult to perceive and ambiguous at best. The district court accordingly erred in concluding it was "*overwhelmingly apparent* to someone who receives plaintiff's application that plaintiff is expressing a pro-advance mail voting message." App.III 644 (emphasis added). Indeed, in addition to those other equally plausible conclusions set forth above, the Northern District of Georgia recognized yet another: "a conclusion that [the voters] are being targeted because they may be more likely to vote for a given candidate." *Raffensperger*, 609 F. Supp. at 1357. The variety of potential interpretations underscores the lack of any "inherently expressive" message here.

***Comparison to Other Cases.*** More generally, the district court failed to consider the implications of its holding, and its deep divergence from existing cases. One recent example provides a useful contrast.

In *Brnovich*, the Supreme Court considered a challenge to an Arizona statute prohibiting third-party collection of voted absentee ballots, with exceptions for caregivers and family/household members. 141 S. Ct. at 2334. Under the district court's logic, this should have been an easy First Amendment case: collecting and delivering cast mail-in ballots for third parties could easily be understood as "advocat[ing] [plaintiffs'] pro-advance mail voting message to underrepresented voters" *at least as well* as merely pre-filling out application forms for them. App.III 658. After all, "only an organization which intends to convey such a message would expend its resources" to collect mail-in ballots from all over the state and deliver them to state election officials. App.III 644.

The district court in *Brnovich*, however, had little difficulty dismantling that claim under *Rumsfeld*: "there is nothing inherently expressive or communicative about collecting a voter's completed early ballot and delivering it to the proper place." *DNC v. Reagan*, 329 F. Supp. 3d 824, 851 (D. Ariz. 2018). And while the *Brnovich* plaintiffs appealed

13

their defeat on virtually *every other legal theory*, they did not see fit to appeal that dismissal of their First Amendment expressive conduct claim. *See DNC v. Reagan*, 904 F.3d 686, 696-97, 702-10 (9th Cir. 2018) (panel opinion) (considering appeal only of First Amendment claim raised under *Anderson-Burdick*, not an expressive conduct claim).

That quiet capitulation is not because the *Brnovich* plaintiffs, represented by one of the more prestigious firms in the country, lacked the creativity of Plaintiffs' counsel here. It rather is because they understood that their First Amendment expressive conduct claim was a surefire loser on appeal to the Ninth Circuit, and therefore elected to proceed on all their other constitutional and statutory challenges save it. (The same reasoning may also explain Plaintiffs' decision not to appeal *Raffensperger* to the Eleventh Circuit.)

## C. Any Inherently Expressive Message Conveyed By Pre-Filling Forms Is Merely Incidental To The State's Regulation Of Conduct

Plaintiffs' First Amendment claim also fails under a long line of cases recognizing that regulations of conduct imposing only incidental burdens on expression do not violate the First Amendment. That is precisely the case here.

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567 (citing *Rumsfeld*). This well-established incidental-burden rule "is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, why 'an ordinance against outdoor fires' might forbid 'burning a flag'; and why antitrust laws can prohibit 'agreements in restraint of trade.'" *Id.* (quoting, *inter alia*, *Rumsfeld*, 547 U.S. at 62) (citations omitted).

Here, Kansas has regulated conduct—the *act* of completing application fields for voters. And the burden on expression is truly minimal, and thus merely incidental, for at least two reasons. *First*, as explained above, the putative "message" is hardly inherently expressive, and instead seems barely discernable, ambiguous, and, at best, contradictory. *Supra* § I.B. *Second*, the *incremental* expressive value of pre-populating pedigree information is *de minimis* when added to the (1) existing expressive materials that Plaintiffs send voters, *specifically* urging them to vote by mail and making *explicit* contentions about the security, safety, and accessibility of mail-in balloting, and (2) sending the absentee ballot application itself—neither of which the State interferes

with. Nor does the State preclude Plaintiffs from sending samples of completed applications to illustrate how to correctly complete them (and thereby convey the same putative "message," whatever that may be). The State only precludes pre-filling of voter information on its own forms.

The marginal expressive value of pre-filling applications is thus minimal, and merely incidental to Kansas's regulation of that conduct. As such, "the First Amendment does not prevent [the] restrictions" at issue here. *Sorrell*, 564 U.S. at 567.

## II. Even Assuming Plaintiffs' Conduct Enjoyed Any Constitutional Protection, The District Court Erred By Failing To Apply *Anderson-Burdick* Doctrine

Even if pre-filling ballot applications enjoyed any First Amendment protection at all, *but see* § I, the district court erred in refusing to analyze Plaintiffs' challenge under the *Anderson-Burdick* doctrine and instead treated it as an ordinary, non-election-related First Amendment claim. The Third, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits have all rejected attempts to assert freestanding constitutional challenges to regulations of electoral administration, and would have applied the *Anderson-Burdick* doctrine here. In addition, the Northern District of Georgia similarly applied *Anderson-Burdick* to a virtually identical

challenge by Plaintiffs to pre-populating absentee ballot applications. *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d at 1355, 1360-61. And this Court has applied similar analysis in *Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000).

To be sure the district court claimed to be applying *Anderson-Burdick* doctrine in the alternative. App.III 658. But instead of attempting to analyze the "burden on the right to vote," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008), as *Anderson-Burdick* requires, the district court instead looked to "burdens [on Plaintiffs'] speech and association." App.III 658. That is *not* applying *Anderson-Burdick*, but instead doubling down on its approach of allowing freestanding First Amendment principles to trump what *Anderson-Burdick* doctrine demands. The district court's "alternative" *Anderson-Burdick* holding is thus nothing more than a restatement of its primary First Amendment holding.

This legal error had obvious prejudice. Plaintiffs' claim is a clear-cut loser under *Anderson-Burdick* doctrine, particularly as the burden is so slight—likely under a minute of voters handwriting their own names and addresses, something they do innumerable times in their daily lives.

### A.    Other Circuits Have Uniformly Held That *Anderson-Burdick* Governs *All* Constitutional Challenges To Regulations Of Electoral Procedures

The Supreme Court has established a well-known, well-worn standard for evaluating constitutional challenges to statutes and regulations governing administration of elections: the *Anderson-Burdick* doctrine. That doctrine derives its name from the Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

*Anderson-Burdick* adopts a balancing test that is dependent on the applicable burden on voting. "Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.*

*Anderson-Burdick* doctrine addresses challenges to all regulations that govern "mechanics of the electoral process." *McIntyre*, 514 U.S. at 345. The Supreme Court accordingly has thus refused to apply "separate Equal Protection Clause analysis" to a third-party ballot-access challenge

in *Anderson*. 460 U.S. at 787 n. 7. *See also Burdick*, 504 U.S. at 344 ("A court considering a challenge to a state election law must [apply the *Anderson-Burdick* standard]." (citing *Anderson*, 460 U.S. at 789)).

The domain of *Anderson-Burdick* doctrine is straightforward: "if [a] law primarily regulates the electoral process, [federal courts] employ [it to] determine the appropriate level of scrutiny." *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 140 (3d Cir. 2022). All such constitutional challenges are thus "folded into the *Anderson/Burdick* inquiry." *Soltysik v. Padilla*, 910 F.3d 438, 449 n.7 (9th Cir. 2018).

There is an important limitation to the applicability of *Anderson-Burdick* doctrine: that framework does not govern "regulation of *pure speech*." *McIntyre*, 514 U.S. at 345 (emphasis added). Thus, "if the law does not primarily regulate the electoral process and instead aims at regulating political speech, it is subject to a traditional First Amendment analysis." *Mazo*, 54 F.4th at 140.

That exception has no application here. Pre-filling ballot applications is *conduct*, and not even arguably "pure speech." Indeed, the district court only granted it First Amendment protection as expressive *conduct*. App.III 614-46. That was error, *supra* § I, but a telling one:

19

neither that court nor Plaintiffs even *argue* that the Act regulates "pure speech."

For that reason, the Northern District of Georgia easily concluded that "distributing forms prefilled with a prospective voter's own personal information" was *not* "the type of interactive debate and advocacy that the Supreme Court found constituted core political speech." *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d at 1355. Instead, "[t]hese actions relate to the administrative mechanisms through which eligible voters request and receive an absentee ballot"; *Anderson-Burdick* thus applied. *Id.* at 1355, 1360-61 (Pre-filling prohibition "govern[ed] the 'mechanics of the electoral process.'" (quoting *McIntyre*, 514 U.S. at 345)).

This Court's sister circuits have had little difficulty rejecting attempts to bring freestanding constitutional challenges to electoral regulations outside of *Anderson-Burdick*. The Third, Fifth, Sixth, Seventh, Ninth, Eleventh, and D.C. Circuits have all considered *and rejected* similar attempts. *All* of them would almost certainly reverse the district court's refusal to apply *Anderson-Burdick* here. This Court should too.

Here is a non-exhaustive sample of those sister-circuit decisions *uniformly* applying *Anderson-Burdick* doctrine to a wide variety of challenges.

**Third Circuit:** "Thus, if the law primarily regulates the electoral process, we employ *Anderson-Burdick* and determine the appropriate level of scrutiny." *Mazo*, 54 F.4th at 140 (challenge to limitation on short slogans candidates could place on ballot alongside their names).

**Fifth Circuit:** "[T]he *Anderson/Burdick* framework provides the appropriate test for the plaintiffs' due process claims." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 233-34 (5th Cir. 2020) (challenge to signature matching and voter-notification procedures for absentee ballots).

**Sixth Circuit:** *Anderson-Burdick* doctrine is the "single standard for evaluating challenges to voting restrictions." *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (challenge to differential deadline for early voting for military and non-military voters).

**Seventh Circuit:** *Anderson-Burdick* "applies to *all* First and Fourteenth Amendment challenges to state election laws." *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019)

(emphasis in original) (challenge to required number of signatures to appear on ballot).

**Ninth Circuit:** The Ninth Circuit explicitly rebuffed a request to apply "traditional First Amendment jurisprudence" to a challenge to an electoral law because "each [such claim] is folded into the *Anderson/Burdick* inquiry." *Soltysik*, 910 F.3d at 449 n.7 (challenge to candidate party description on ballots). *Accord Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021) (challenge to election-day deadline for curing failure to sign mail-in ballot) (Vratil, J., on panel).

**Eleventh Circuit:** "The standard is clear: 'We must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*.'" *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (cleaned up, citation omitted) (challenge to requirement that absentee ballots be received, and not merely postmarked, by close of polls).

**D.C. Circuit:** Employing "a single basic mode of analysis" for constitutional challenges to electoral regulations. *LaRouche v. Fowler,* 152 F.3d 974, 987-88 (D.C. Cir.1998) (challenge to procedures awarding delegates for Democratic nomination for President).

*     *     *     *     *

The upshot is that *every* court of appeals considering a similar attempt to assert a freestanding constitutional challenge to a regulation governing election administration outside of the *Anderson-Burden* framework has explicitly rejected the gambit. The district court clearly erred in splitting with all these authorities, which it made no attempt to acknowledge—let alone distinguish. And that error is particularly manifest as the district court also made no effort to acknowledge or respond to the Northern District of Georgia's *correct* resolution of an effectively identical claim by Plaintiffs here.

The district court's unexplained departure from all other relevant precedents thus rests on legal error and should be reversed.

**B.    This Court Similarly Refused To Permit Freestanding Constitutional Challenges Outside Of the *Anderson-Burdick* Framework**

Although this Court has not directly addressed whether it agrees with the single-framework standard of its sister circuits, it has adopted reasoning consistent with that approach. For example, in *Campbell v. Buckley*, plaintiffs attempted to assert a claim that an electoral regulation governing titles for initiatives "abridge[d] their First

23

Amendment rights." 203 F.3d at 742. But to evaluate that claim, this Court tellingly "selected the balancing test" of *Anderson-Burdick*, rather than applying strict scrutiny as it would have in an ordinary First Amendment case. *Id.* at 742, 745-46. And while *Campbell* does note, in dicta, that strict scrutiny may apply where "the government restricts the overall quantum *of speech* available to the election or voting process," *id.* at 745 (emphasis added), this case involves purportedly expressive *conduct*, not speech. Nor does the State preclude Plaintiffs from conveying their message in other ways—they only may not do so on the State's own form. *Supra* at 15-16. The same quantum of speech is thus available, rendering the *Campbell* dicta wholly inapplicable to this case.

Similarly, this Court has applied *Anderson-Burdick* to electoral regulations following *Campbell*. For example, this Court recently reiterated that it "analyze[s] electoral regulations using the now-familiar *Anderson–Burdick* balancing test" even where the plaintiffs there asserted a First Amendment "freedom of association" claim. *Utah Republican Party v. Cox*, 892 F.3d 1066, 1076-77 (10th Cir. 2018). At least seven other circuits all would have done the same. *Supra* § II.A.

The district court appears to have relied in part on *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008) to evade *Anderson-Burdick*. App.III 649. That was error. *Yes on Term Limits* involved a ban on certain types of petition circulators, which both regulated "core political speech" and affected the quantum of speech available. *Id.* at 1028-29. Accordingly, "strict scrutiny [wa]s the correct legal standard." *Id.* at 1029. But this case involves *at best* expressive *conduct*, and certainly not "pure" or "core political" speech. Nor is the total quantum of speech affected. *Supra* at 15-16, 24.

Nor did *Yes on Term Limits* even address the possibility that *Anderson-Burdick* doctrine might apply, supplying neither analysis nor binding precedent on this issue. *See, e.g.*, *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'").

This Court has thus previously adopted reasoning entirely consistent with the approach of its sister circuits and has no precedential barriers to joining them explicitly.

### C.     The District Court's Approach Would Invite Electoral Chaos

The district court's approach is also deeply problematic because it would frustrate orderly operation of elections and result in federal micromanagement of how elections are conducted—even though the Constitution gives the States responsibility to run them, absent congressional override. U.S. Const. art. I § 4 cl. 1. Specifically, by subjecting election regulations imposing only minimal burdens to strict scrutiny whenever they arguably have some tendency to convey a "message" about particular voting methods, a *vast swath* of state regulations could be invalidated. This case exemplifies the danger, as the burden on voters here is infinitesimal.

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election—and campaign-related disorder." *Timmons*, 520 U.S. at 358. Thus, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

It is further a truism that all "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433.

"Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, *would tie the hands of States seeking to assure that elections are operated equitably and efficiently*." *Id.* (emphasis added).

The district court's approach flouts these clear directives—subjecting electoral laws to strict scrutiny whenever they regulate activities that convey a putative "message" that voting is "safe, secure and accessible." App.III 643. That standard plainly "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433.

The district court's opinion also fails to grapple with the obvious implications of its approach. *Paying* voters to vote by mail, not necessarily in any particular way, would convey the payor's "message" that voting by mail is desirable and accessible, and that voters should do it. (Notably, paying voters to vote in a particular way is even *more* likely to be "inherently expressive" as to what candidates the organization thinks should be elected.) But States should hardly be required to satisfy strict scrutiny to prohibit "purchasing" mail-in voters.

Or take another troubling example, perhaps even closer to this case: suppose third parties offer to *vote and mail* ballots for the voter after the voter has signed the ballot affidavit, essentially collecting blank-check ballots for organizations to vote themselves. After all, uniformly voting for Democratic or Republican candidates could easily send a *far* more expressive message than merely pre-filling names and addresses on absentee ballot applications. But States surely do not need to satisfy strict scrutiny to forbid such universally condemned tactics.[3]

Finally, consider the ballot harvesting prohibited in *Brnovich*. That third-party harvesting of voted ballots similarly could be conceptualized as conveying an "inherently expressive" message about mail-in voting. After all, collecting and delivering cast mail-in ballots for third parties can easily be understood as "advocat[ing] [plaintiffs'] pro-advance mail voting message to underrepresented voters" *at least as well* as merely pre-filling out applications for them. App.III 658. And, under the district court's logic, "only an organization which intends to convey such a [pro-vote-by-mail] message would expend its resources" to harvest ballots,

---

[3] *See*, *e.g.*, *Hobbs*, 18 F.4th at 1182 (ballot affidavit requires voter to attest that "I voted the enclosed ballot" except in case of disability).

thereby making the ballot collection protected expressive conduct. App.III 658.

But the *Brnovich* plaintiffs abandoned their First Amendment expressive conduct claim, and for good reason. *Supra* at 13-14. That claim fails here for the same reasons as it did in *Brnovich*. *Id.*

### D. The District Court's Error Requires Reversal

The district court's refusal to apply the *Anderson-Burdick* standard here was plainly prejudicial. That error requires reversal.

Under that framework, only "'[r]egulations imposing severe burdens'" on the right to vote "'must be narrowly tailored and advance a compelling state interest.'" *Campbell*, 203 F.3d at 743 (quoting *Timmons*, 520 U.S. at 358). The burden on the right to vote at issue here is not even conceivably "severe." Indeed, it is *de minimis* at best.

Under the challenged Act, Plaintiffs cannot pre-fill out forms to vote by mail for voters—thus requiring voters to fill in their own name and address. It is doubtful that the burden imposed on typical voters would take them even 60 seconds to complete.

That trivial burden is *orders of magnitude* less than the burden at issue in *Crawford*—which the Court held was not severe. In *Crawford*,

the burden at issue was the "inconvenience of making a trip to the BMV [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph"—which the Court held *surely does not qualify as a substantial burden on the right to vote.*" *Crawford*, 553 U.S. at 198 (emphasis added) (plurality opinion); *accord id.* at 204 (Scalia, J., concurring joined by Thomas and Alito, JJ.) ("[T]he burden at issue is minimal and justified").

If the burden in *Crawford* "surely d[id] not qualify as a substantial burden on the right to vote," 553 U.S. at 198, it beggars belief that voters being required to fill out a minimal amount of pedigree information about themselves does.

More generally, "there is no constitutional right to an absentee ballot" *at all*. *Mays*, 951 F.3d at 792. Given the absence of any underlying right to vote by mail, the State merely requiring voters to fill out a few fields in a form to obtain an absentee ballot cannot qualify as a "severe burden."

The district court tried to sidestep all of this *required* analysis under *Anderson-Burdick* by pointing to "burdens [on] speech and association." App.III 658. But those are also minimal. *See supra* §§ I.B,

30

I.C. And, in any event, that is precisely what the single-standard rule applied by *all* of the circuits identified above precludes: importing standards from other constitutional claims into the *Anderson-Burdick* framework to short circuit the analysis of the *actual* burden imposed. The district court erred by relying upon First Amendment principles, rather than focusing on the true "burden on the right to vote." *Crawford*, 553 U.S. at 198.

In the end, the burdens imposed by the Act are truly *trivial*—and far less than those in *Crawford*, which were not even conceivably "severe." The district court's conclusion that the Act imposes a "severe" burden is untenable under *Anderson-Burdick* and underscores just how far it had departed from settled precedent and common sense. To characterize the burden at issue here as "severe" is to strip all meaning from that concept.

## III. The District Court Misapplied Anderson-Burdick By Wrongly Discounting Kansas's Important Regulatory Interests

The district court gave short shrift to Kansas's several articulated compelling interests for regulating third-parties' direct engagement in the absentee voting process. In particular, the district court erroneously

discounted Kansas's interest in conducting orderly and efficient elections by refusing to consider meaningfully the ample evidence of confusion, disorder, and burdens on election officers that VPC's conduct has occasioned in other States. *See* App.III 663-64. Once that evidence is properly considered, the strength of Kansas's interests is easily sufficient to sustain the Act.

The tactics that VPC and its affiliate Center for Voter Information ("CVI") wish to employ in Kansas have caused enormous problems in other states. These groups have a long, publicly documented "history of sending error-ridden mailers" that can—and have—caused voter confusion and chaos in election administration in prior elections.[4]

Examples abound. In Virginia in 2020, CVI mailed out nearly 600,000 absentee ballot applications to voters with the wrong return address.[5] That error "sowed confusion for many voters and local election

---

[4] https://www.washingtonpost.com/local/virginia-politics/virginia-absentee-ballot-mixup/2020/08/06/5c4029ee-d764-11ea-930e-d88518c57dcc_story.html

[5] https://www.vpm.org/news/2020-08-06/voter-registration-group-sends-500000-incorrect-forms; https://www.virginiamercury.com/2020/08/06/nonprofit-mails-587638-erroneous-absentee-ballot-applications-to-virginia-voters/.

officials, who quickly sought to inform voters it was not coming from an official government source."[6] Election officials in the impacted localities were burdened with a flood of calls from voters, with Fairfax County's voter registrar explaining that the mistakes "caus[ed] great confusion and concern among voters who have been contacting [his] office."[7]

In 2020, CVI ignored North Carolina's ban on pre-filling absentee applications, mailing 80,000 invalid forms to voters.[8] The mailings led the State's elections director to issue a statement pleading with third-party groups to "consider the overwhelming toll that misleading or confusing mailings … take on elections resources and the damage they cause to voters' confidence in elections…."[9] A Duke election law professor and Democratic member of Wake County's election board also complained that he and his wife personally received "at least seven unsolicited mail ballot applications since he voted" from VPC, which he

---

[6] https://www.virginiamercury.com/2020/08/06/nonprofit-mails-587638-erroneous-absentee-ballot-applications-to-virginia-voters/

[7] https://www.virginiamercury.com/2020/08/06/nonprofit-mails-587638-erroneous-absentee-ballot-applications-to-virginia-voters/

[8] https://www.ncsbe.gov/news/press-releases/2020/06/11/advocacy-group-sends-invalid-absentee-ballot-request-forms-80000

[9] https://abc11.com/absentee-ballot-request-mail-in-center-for-voter-participation/6359564/

found "extremely disruptive and reaches the level of a disinformation campaign."[10]

VPC also has a history of mass mailing pre-filled voter registration applications addressed to the names of dogs, long-dead voters, non-citizens, and already registered voters.[11] On one pre-filled form sent by VPC, for example, "Rosie Charlston's name was complete, as was her Seattle address"; one problem: "Rosie was a black lab who died in 1998."[12] Attempting to register dead pets is something of a motif for VPC, who has sought to register (1) "Mozart," a deceased dog in Virginia,[13] (2) Gracey Duncan in Florida, an orange tabby cat who had passed away a few years before,[14] and (3) Moco Lucero, a Colorado dog that died a whopping 18 years prior.[15]

---

[10] https://www.propublica.org/article/a-nonprofit-with-ties-to-democrats-is-sending-out-millions-of-ballot-applications-election-officials-wish-it-would-stop

[11] https://www.cbsnews.com/news/nonprofit-voter-participation-center-sends-election-registration-docs-to-dogs-dead-people/

[12] *Id.*

[13] *Id.*

[14] https://www.politico.com/states/florida/story/2016/04/dead-cat-at-heart-of-florida-election-controversy-033013

[15] https://www.9news.com/article/news/local/next/denver-dog-thats-been-dead-18-years-receives-voter-registration-form/73-531472682

These persistent errors predictably create enormous headaches for election officials. In 2020, for example, over half of Florida's county election supervisors wrote to the Secretary of State about VPC/CVI's "scam mailers," asking the Secretary to step in before they "carpet bomb[ed] Floridians with more voter registration deception" in the form of pre-filled applications.[16] Those election officials explained:

> [O]ur offices are inundated with terrified voters who are concerned that their personal information has been compromised or wrongly shared and they are especially upset when—as it happens all-too-frequently—the data used by this shadow group is wrong and thereby causes further alarm.[17]

These examples illustrate the burdens on election administrators, who must respond to confused (and often angry) voters and process duplicate applications at a time when they are already stretched thin with actual business of conducting imminent elections. That task is difficult enough without the added burden of cleaning up the messes of third parties with a history of careless errors.

The district court, however, effectively ignored all the evidence from other States that Kansas had submitted on this front. That was error.

---

[16] https://shorturl.at/bpuO2.

[17] *Id.*

35

The Kansas "Legislature was not obligated to wait for something similar to happen closer to home" before it could act to protect itself from the chaos that Plaintiffs had occasioned in Virginia, North Carolina, Florida, and elsewhere. *Brnovich*, 141 S. Ct. at 2348.

## CONCLUSION

The district court's judgment should be reversed.

August 2, 2023                    Respectfully submitted,

By */s/* Drew C. Ensign

Sylvia May Mailman            Drew C. Ensign
Restoring Integrity & Trust   202 E. Earll Drive
in Elections                  Suite 490
1233 20th St NW               Phoenix, Arizona 85004
Washington, D.C. 20036        Telephone: (602) 542-3333
MayMailman@riteusa.org        Fax: (602) 542-8308
                              drensignlaw@gmail.com

*Counsel for Amicus Curiae RITE*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(a)(5).

1. This brief is 6,379 words excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type, which complies with Fed. R. App. P. 32(a)(5) and (6).

*/s/* Drew C. Ensign

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will served by the appellate CM/ECF system.

*/s/* Drew C. Ensign